**LaSALLE TALMAN BANK, F.S.B.,**
**Plaintiff–Appellant,**

**v.**

**UNITED STATES, Defendant–**
**Cross Appellant.**

Nos. 00–5005, 00–5027.

United States Court of Appeals,
Federal Circuit.

Jan. 14, 2003.

Rehearing Denied March 13, 2003.

Wilber H. Boies, McDermott, Will & Emery, of Chicago, IL, argued for plaintiff-appellant. With him on the brief were John H. McDermott, Marie A. Halpin, and Suzanne M. Wallman. Of counsel on the brief was Thomas P. Steindler, McDermott, Will & Emery, of Washington, DC.

Jeanne E. Davidson, Deputy Director, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for defendant-cross appellant. With her on the brief were David M. Cohen, Director; Rodger D. Citron, John A. Davidovich, and William F. Ryan, Trial Attorneys, Commercial Litigation Branch; and Thomas M. Bondy, Scott R. McIntosh, and Susan Pacholski, Attorneys, Appellate Staff. Of counsel were Shalom Brilliant and Patrick T. Murphy, Trial Attorneys, Commercial Litigation Branch.

John V. Thomas, Associate General Counsel, Federal Deposit Insurance Corp., of Washington, DC, for amicus curiae Federal Deposit Insurance Corporation. With him on the brief were Dorothy A. Doherty, John M. Dorsey III, and Richard S. Gill, Counsel.

Before NEWMAN, Circuit Judge, FRIEDMAN, Senior Circuit Judge, and LOURIE, Circuit Judge.

PAULINE NEWMAN, Circuit Judge.

The history of the savings and loan crisis of the 1980s and the ensuing enactment of the Financial Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA), Pub.L. No. 101–73, 103 Stat. 183 (Aug. 9, 1989) (codified in scattered sections of 12 U.S.C.) is summarized in *United States v. Winstar Corp.*, 518 U.S. 839, 843–58, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996) and related decisions. This suit is one of many based on *Winstar* principles.

The LaSalle Talman Bank (herein LaSalle) appeals the judgment of the United States Court of Federal Claims,[1] wherein that court found the government liable for breach of contract following enactment and implementation of FIRREA, but rejected LaSalle's claim for damages other than the award of $5,008,700 for expenses incurred in connection with the FIRREA-forced sale of LaSalle's predecessor bank (Talman) to the ABN AMRO bank, N.V. The principle underlying the court's judgment was that LaSalle was at least as well off after the breach as if the breach had not occurred, based on its earnings as a subsidiary of ABN AMRO. The United States cross-appeals the judgment of liability, but does not appeal the damages as awarded if liability is sustained.

We affirm the judgment of liability, and the ruling that damages due to the breach are subject to offset or mitigation by the benefits of the actions taken after the breach. However, the mitigation is limited to actions reasonably directly related to the breach and its proximate consequences. We remand for redetermination of damages.

## BACKGROUND

In 1982 the Talman Home Federal Savings and Loan Association of Illinois (Talman) was failing, due to the extreme rise in interest rates. Talman had fallen out of capital compliance with federal regulatory requirements and was approaching insolvency. The Federal Savings and Loan Insurance Corporation (FSLIC) estimated that Talman would reach negative net worth during 1982, and the FSLIC together with the Federal Home Loan Bank Board (FHLBB) pressed Talman to enter into the "Phoenix" program.[2]

The Phoenix program was devised by the federal authorities as an extraordinary measure in their attempts to sustain the savings and loan industry and avert exhaustion of the FSLIC insurance fund.

---

1. *LaSalle Talman Bank F.S.B. v. United States,* 45 Fed. Cl. 64 (1999); *California Fed. Bank v. United States,* 39 Fed. Cl. 753, 765–66, 779 (1997).

2. The phoenix was a mythical bird that upon being consumed in the fire of its funeral pyre would arise from the ashes in the freshness of youth.

The methodology was to consolidate several failing or failed thrifts into a single association that would not only achieve efficiencies and receive close regulatory oversight, but would also receive significant assistance from the federal government. This assistance included direct monetary contributions, regulatory forbearances, and authorization to use a purchase accounting system whereby assets and liabilities would be revalued at market price and the ensuing net liability would be recorded as an asset called "supervisory goodwill" and accorded an extended amortization term.

This accounting procedure would permit the new thrift association to absorb the assumed liabilities through annual amortization, while the thrift would recognize accretion income over a shorter period through purchase accounting. As the Court observed in *Winstar*, 518 U.S. at 853, 116 S.Ct. 2432, by this procedure the new thrift could record a profit despite continuing losses, aiding its nominal compliance with regulatory capital requirements until economic circumstances improved. The thrift would also receive direct monetary contributions from the government, in exchange for which the government would receive "income capital certificates," interest-bearing promissory notes that the FSLIC could redeem or forgive in the future. The FHLBB would be authorized to exercise control of the management of the new association, including appointment of its directors and approval of its operations.

Talman agreed to participate in the Phoenix program, and in early 1982 Talman merged with three other failing or failed Illinois thrifts: the North West Federal Savings and Loan Association; Alliance Savings and Loan Association; and Unity Savings Association, a thrift that had already been placed in receivership with the FSLIC as receiver. Talman was selected by the regulators as the surviving entity. The FSLIC appointed independent directors to replace the majority of Talman's board, imposed various operating restrictions, and required Talman to replace its chief executive officer.

The evidence showed, and the trial court found, that it was understood that the key to viability of the new Talman thrift association was the use of purchase accounting with the ensuing net liabilities to be treated as goodwill assets subject to long-term amortization, accompanied by forbearances as to capital requirements. Thus Talman was authorized to account for its and North West's, Alliance's, and Unity's net liabilities, which totaled $912 million, as supervisory goodwill to be amortized over forty years. These arrangements were recorded in various documents among and within the participating thrifts and government agencies. Talman received an initial cash contribution from the FSLIC in the amount of $10 million, for which it issued income capital certificates. In August 1982 Talman absorbed another failing Illinois thrift, the First Federal Savings and Loan Association of Peoria; Talman was again authorized to account for Peoria's net liabilities as goodwill assets to be amortized over forty years. The new Talman bank now had net liabilities designated as supervisory goodwill totaling $912,614,000.

Talman's progress toward recovery was implemented by its new chief executive officer Theodore Roberts, an experienced banker and skilled administrator. From 1983 to 1986 Talman sold 90% of its tangible assets for a realized gain of $254.6 million, received another $125 million in cash from the FSLIC to replace $125 million of goodwill, and the FSLIC canceled $71.6 million of income capital certificates. Talman and the FSLIC entered into further agreements in 1986, and in the

"Agreement Regarding Goodwill" Talman agreed to reduce its goodwill by another $100 million, for which the FSLIC provided $100 million in cash plus $65 million in cash to augment Talman's core capital; Talman and the FSLIC agreed to reduce the goodwill amortization period from forty to thirty years. Talman also agreed to convert from a mutual association to a stockholder-owned company, and the ensuing stock offering raised a net of $71.8 million in new capital.

Through the combination of sound management, asset sales, cash additions that totaled $585.6 million, declining interest rates, the accounting procedures for supervisory goodwill, and debt forgiveness by the FSLIC, Talman satisfied the existing regulatory capital requirements and returned to nominal profitability in 1986. Talman continued to show a profit, employing the goodwill accounting procedures, until the enactment of FIRREA. Meanwhile, however, the savings and loan crisis in the nation remained critical, the FSLIC insurance fund was exhausted, and insolvencies continued. FIRREA set new tangible capital, core capital, and risk-based capital requirements for savings and loan associations, all more rigorous than had previously existed, and eliminated the use of goodwill toward meeting capital requirements. At that time Talman had $514 million in net liabilities designated as goodwill assets.

Talman could not meet FIRREA's new criteria, and faced the prospect of imminent receivership unless an acceptable capital compliance plan could be devised. In March 1990 the Office of Thrift Supervision[3] and Talman agreed on a plan for sale of assets and other conditions that included acceleration of Talman's deadline for achieving capital compliance to December 31, 1993, one year earlier than the deadline established by FIRREA. Talman also sought to raise additional capital, but its proposals to do so through the sale of stock were rejected by investment bankers as infeasible while Talman operated under the constraints imposed by the OTS. The matter of survival became even more urgent when the OTS informed Talman in June 1991 that to avoid closure it would have to achieve full capital compliance by the end of 1991, two years ahead of the date set in the 1990 capital compliance plan.

Talman had also been pursuing attempts to raise capital by way of merger or acquisition. After intensive effort, led by Talman's CEO Roberts, the Netherlands bank ABN AMRO agreed to purchase the 9.7 million outstanding shares of Talman stock for $10 per share and to provide the additional cash needed to meet the OTS capital requirements, accompanied by further shrinkage of the bank in order to reduce these requirements. Talman sold $700 million of mortgage-backed securities, dissolved seven of its eight finance subsidiaries by redeeming $555 million in preferred stock, and sold its Peoria branch offices, reducing its assets from $5.83 billion in September 1991 to $4.92 billion by early 1992. Talman had been permitted to continue to amortize goodwill while seeking recapitalization, and at year-end 1991 had $467.8 million of unamortized supervisory goodwill. Upon its acquisition of Talman in February 1992 ABN AMRO provided $300 million in cash, the capital required by the OTS to bring Talman into compliance with the FIRREA capital requirements. All goodwill was eliminated.

Within about a year Talman achieved profitability, guided by good management

---

3. Under FIRREA, the FHLBB and the FSLIC were replaced by the Office of Thrift Supervision (OTS).

and aided by falling interest rates. Talman and ABN AMRO then embarked on a program of growth, financed by ABN AMRO. In 1994 ABN AMRO provided $134 million for the purchase of branches of Home Savings of America. In 1995 Talman was merged with the LaSalle Cragin bank, which had been acquired by ABN AMRO in 1994 for $488.9 million. (The merged bank became the LaSalle Talman Bank.) In 1997 ABN AMRO provided $167.5 million for the purchase of Bell Savings branches. The Court of Federal Claims found that ABN AMRO provided $800 million in cash beyond the initial $300 million, and that by the end of 1997 LaSalle's assets had increased, through acquisition and growth, to more than $11.5 billion. Over the period 1993 to 1998 LaSalle made dividend payments to ABN AMRO totaling $417.8 million.

Meanwhile, in September 1992 Talman brought this suit in the Court of Federal Claims, seeking damages for the FIRREA-induced breach of the government's contractual obligations. Although Talman had avoided receivership and soon became profitable as a subsidiary of ABN AMRO, LaSalle argues that this achievement was the result of extraordinary efforts and superb management, and that its successful survival does not negate its entitlement to damages for the costs and losses due to the government's breach of contract.

The Court of Federal Claims granted LaSalle's motion for summary judgment on the issue of liability for breach of contract, and conducted a trial of the damages issues. The court declined to award damages on any of LaSalle's proposed measures, including lost profits, the cost of replacement capital, and restitution (and other theories not appealed), and limited the damages award to the costs incurred by Talman in order to achieve its acquisition by ABN AMRO. The government appeals the underlying liability judgment,

and LaSalle appeals the court's denial of the requested damages.

## I

The government, challenging the judgment of liability, asserts that there was no breach of contract because some of the undertakings and promises in connection with the 1982 mergers and the 1986 rearrangements were recorded not in executed contracts but in agency documents. However, the Court in *Winstar* resolved the contractual nature of the totality of the agreements, promises, and undertakings relating to the assumption of liabilities, purchase accounting, and the treatment of supervisory goodwill and its amortization.

█ The government argues that this case differs from *Winstar* because Talman did not achieve pre-FIRREA capital compliance until 1986, instead of immediately upon creation of the $912.6 million in supervisory goodwill in 1982. The government argues that Talman was approaching insolvency in 1982 and was simply trying to stay afloat by entering the Phoenix program, and that the accounting use of supervisory goodwill and long term amortization was a benevolence of the government, but not a contractual obligation of the government. The government proposes that the promises concerning goodwill did not constitute a contract, and therefore that there was no breach of contract by the enactment and implementation of FIRREA.

We discern no error in the finding of the Court of Federal Claims that the governmental conditions and understandings whereby Talman and the other Illinois thrifts were merged in 1982, and their revision in 1986, were contractual in nature. The basic 1982 commitments of the FSLIC and FHLBB included a Financing Agreement with the thrifts, and agreements concerning the purchase accounting

method of determining liabilities and the accounting treatment of these liabilities as goodwill assets subject to amortization over forty years. FHLBB Resolution 82–110, in which the FHLBB approved Talman's association with and assumption of the liabilities of the Unity, Alliance, and North West thrifts, authorized and anticipated that the surviving thrift would use the procedures of purchase accounting and supervisory goodwill, provided only that Talman submit a stipulation of its intent to do so, as set forth in Bank Board Memorandum R–31b. FHLBB Resolution 82–596, approving the Peoria transaction, contained similar terms. Mr. H. Brent Beesley, FSLIC Director in 1982, testified that these procedures were necessary in order for the mergers of failing thrifts to "work as it was planned." Although the government argues that the absence of express incorporation of the Bank Board Resolutions into the FSLIC–Talman contracts insulates the government from liability, the Court in *Winstar* established that the arrangements were contractual. The marginal financial condition of Talman in 1982 does not alter the fact that it assumed much larger liabilities upon the undertakings and commitments of the government under the Phoenix program. As the Court observed in *Winstar,* there would be little reason for any thrift to assume added liabilities if that assumption would place it in immediate danger of receivership and dissolution.

These arrangements concerning goodwill, and the infusion of capital from various sources, enabled Talman in 1986 to meet the existing capital requirements. The accounting benefits were preserved in the October 2, 1986 "Agreement Regarding Goodwill," which reduced the amortization term to thirty years. It is undisputed that Talman would not have been in regulatory compliance after 1986 without the goodwill asset and long-term amortization thereof. The government's argument that

only the amortization period was contractual in nature, but not the right to rely on goodwill in 1982 or to continue to rely on goodwill after 1986, is contrary to the record and was properly rejected by the Court of Federal Claims.

The government and Talman operated under these arrangements until the enactment of FIRREA. These arrangements, although artifacts of accounting, had real value, for they enabled the thrift to meet the statutory and regulatory capital requirements. Enactment of FIRREA deprived Talman of $514 million in goodwill and placed it in a position of negative net worth. As discussed in *Winstar,* the right to account for goodwill as a capital asset to meet regulatory requirements, and to amortize it over an extended period, was abrogated by FIRREA. The judgment of liability for breach of contract is affirmed.

## II

In assessing damages for breach of contract, the Court of Federal Claims held that lost profits presumptively measure the damages flowing from the breach implicit in the enactment of FIRREA, *see California Federal Bank, FSB v. United States,* 245 F.3d 1342, 1346–48 (Fed.Cir. 2001), and that Talman's projected profits but for the breach would be the most reasonable measure of damages. *See Glendale Federal Bank, FSB v. United States,* 239 F.3d 1374, 1389 (Fed.Cir.2001). However, the court also held that Talman's actual profits during the period from the breach until the date of trial (and projected as discounted to the end of the contract term in 2012) should be credited against Talman's hypothetical "but for" profits. On this basis the court found that damages had been fully mitigated.

LaSalle's appeal is based primarily on the argument that it was incorrect to credit its actual profits as a subsidiary of ABN

AMRO in measuring damages for breach. Although we conclude that the Court of Federal Claims was correct in crediting actual profits after the breach, in mitigation of the injury caused by the breach, we also conclude that the court erred in including remote or unrelated activities and profits thereon as contributing to the mitigation.

### A

■ The principle of contract damages is that the non-breaching party is entitled to the benefits it reasonably would have received had the contract been performed, that is, profits that would have been earned but for the breach. *United States v. Behan*, 110 U.S. 338, 345, 4 S.Ct. 81, 28 L.Ed. 168 (1884). *See also Glendale*, 239 F.3d at 1380 (expectancy damages often are equated with lost profits, and may include other damage elements) (citing *Restatement (Second) of Contracts* § 347). Thus LaSalle claims the profits that would have been produced had Talman continued after 1989 to count supervisory goodwill toward the regulatory capital requirements and to leverage its value. LaSalle states that Talman successfully leveraged its supervisory goodwill and earned net profits of $28 million in 1986, $21 million in 1987, and $22 million in 1988, and that its lost profits model simply projects those actual profits into the future. LaSalle also seeks recovery of its losses during 1990–1992 when Talman was attempting to comply with the new FIRREA capital requirements, before its acquisition by ABN AMRO. During this period, as found by the Court of Federal Claims, Talman lost $1.9 million in mortgage servicing when various mortgage transactions became prohibited by FIRREA, and $6.6 million in lost profits due to the sale of various assets in order to shrink the bank and reduce its capital requirements. LaSalle projected lost profits of $401.3 million over the period from the end of 1991, had Tal-

man been permitted to retain its then $467.8 million of unamortized supervisory goodwill, until 2012, the end of the thirty-year contract term.

Although the government disputes some aspects of these calculations, their precision became secondary upon the ruling of the Court of Federal Claims that the actual profits earned as a subsidiary of ABN AMRO must be credited against Talman's projected lost profits. The court rejected LaSalle's proffered damages formula that would have compared its projected profits after the breach with its projected profits but for the breach; that is, a formula ignoring the role of ABN AMRO.

■ The ruling of the Court of Federal Claims implements the general principle that the non-breaching party is not entitled, through the award of damages, to achieve a position superior to the one it would reasonably have occupied had the breach not occurred. *See generally* 3 E. Allen Farnsworth, *Farnsworth on Contracts* 193 (2d ed.1998):

> No matter how reprehensible the breach, damages are generally limited to those required to compensate the injured party for lost expectation, for it is a fundamental tenet of the law of contract remedies that an injured party should not be put in a better position than had the contract been performed.

LaSalle argues that this is not an invariable rule, and points to precedent that it is improper to credit the wrongdoer with the profits that the non-breaching party was able to achieve, through no action by the wrongdoer, in mitigating the damages caused by the breach. Indeed, precedent takes cognizance of the remoteness, as contrasted with the proximity, of ensuing events. However, when there is a direct relation, in time and in subject matter, between the breach and mitigating events, the damages are reduced accordingly. *See*

*Restatement (Second) of Contracts* § 347(c) cmt. e:

If [the nonbreaching party] makes an especially favorable substitute transaction, so that he sustains a smaller loss than might have been expected, his damages are reduced by the loss avoided as a result of that transaction.

*E.g., United States v. City of Twin Falls,* 806 F.2d 862, 873–74 (9th Cir.1986) (contract damages to non-breaching party are properly offset by gains after breach because contract damages seek only to "fairly compensate the injured party for his loss").

Unlike the situation in *Hughes Communications Galaxy v. United States,* 38 Fed. Cl. 578 (1997), where the profits after breach were found to be a remote consequence, in this case the acquisition of Talman by ABN AMRO was a direct consequence of the government's breach, and indeed was an extreme measure forced by the legislation and the failure of other attempts to achieve the capital compliance required by the legislation. The recapitalization to replace the lost goodwill is fairly viewed as such a substitute transaction, and the Court of Federal Claims correctly held that the injury to Talman was subject to mitigation by this event.

LaSalle states that only through its own management skills and herculean efforts did Talman survive the FIRREA-induced breach, and that if its gains after its forced sale to ABN AMRO could be used to reduce the damages owed by the breaching party, that is tantamount to giving the wrongdoer credit for its wrongdoing. LaSalle points to the large liability to depositors that the government would have suffered had Talman not taken this initiative, and points out that had this case been decided in 1992, when it was filed, the government would have borne the full consequences of Talman's FIRREA-forced sales of assets, as well as of imminent receivership. Indeed, the government does not dispute that the situation could have been vastly different had Talman not taken this survival initiative. However, as Professor McCormick explains:

Where the defendant's wrong or breach of contract has not only caused damage, but has also conferred a benefit upon plaintiff … which he would not otherwise have reaped, the value of this benefit must be credited to defendant in assessing the damages.

Charles T. McCormick, *Handbook on the Law of Damages* 146 (1935).

■ LaSalle invokes the "collateral source rule," a rule grounded in precedent and holding that collateral benefits received by the injured party do not reduce the damages owed by the wrongdoer. The collateral source rule arises primarily in connection with tort damages, and presupposes some wrongful act by the breaching party. This rule has been applied in connection with breach of contract, when there is a tortious or negligence component to the breach, or when the equitable balance is such that any windfall should not benefit the wrongdoer. Illustrating these principles, compare *United Protective Workers of America, Local No. 2 v. Ford Motor Co.,* 223 F.2d 49, 54 (7th Cir. 1955) (the measure of contract damages is limited to compensation when there is no bad faith or misconduct) with *Great Lakes Transmission Co. v. Grayco Constructors, Inc.,* 506 F.2d 498 (6th Cir.1974) (declining to reduce contract damages by the value of a collateral benefit when the breaching party was also negligent).

We do not deem the collateral source rule to be applicable in this case, where the breach of contract was due to an Act of Congress. The purpose of the FIRREA legislation was to make a fundamental change in savings and loan regulatory policy and procedure, for the greater public

benefit. Neither bad faith nor misconduct nor negligence can be attributed to the governmental actions that produced the FIRREA-based breach of contract. Government liability for the abrogation of contracts flows from the government's obligations to those with whom it deals, and is rarely subject to encumbrance by wrongdoing.

Thus although LaSalle argues that it is contrary to contract principles and sound policy to give the breaching party the benefit of the injured party's efforts in mitigation, the Court of Federal Claims correctly held that benefits achieved by Talman after the breach should be included in mitigation of damages. The court correctly rejected LaSalle's proposed formula whereby comparison would be made between Talman's projected profits but for the breach and its projected profits after the breach, but without including the impact of ABN AMRO. We affirm the principle that Talman's profits as an ABN AMRO subsidiary should be recognized as reducing the damages attributable to the breach. However, this recognition is limited to profits directly due to the actions in mitigation, as we next discuss.

## B

■ The Court of Federal Claims, finding that Talman and LaSalle's actual profits as an ABN AMRO subsidiary until the time of trial (1998) exceeded, by over $400 million, Talman's reasonably projected profits had there been no breach, ruled that damages were fully mitigated.

■ LaSalle states that the total cash investments by ABN AMRO over the period before trial were an additional $800 million beyond the initial $300 million FIRREA-required recapitalization, and that this additional investment was for purposes unrelated to the breach and its mitigation. LaSalle points out that these subsequent capital investments were for ABN

AMRO-financed acquisitions and mergers, and that the profits therefrom were inappropriately credited as mitigation of the breach. It is not disputed that this additional capital was not required by, and was not a product of, the FIRREA-induced breach. The general rule is as articulated by Justice Holmes, that unrelated events and remote consequences do not reduce the liability of the wrongdoer for the losses caused by the wrong:

> The general tendency of the law, in regard to damages at least, is not to go beyond the first step. As it does not attribute remote consequences to a defendant so it holds him liable if proximately the plaintiff has suffered a loss.... Their claim accrued at once in the theory of the law and it does not inquire into later events.

*Southern Pacific Co. v. Darnell–Taenzer Lumber Co.*, 245 U.S. 531, 533–34, 38 S.Ct. 186, 62 L.Ed. 451 (1918) (although the plaintiffs were able to pass on the overcharge, this did not bar their recovery of the overpayment). *See* 1 *Dobbs Law of Remedies*, § 3.8(2) (2d ed. 1993) ("One effect of a market damages measurement then is to ignore later events, whether they are favorable to the plaintiff or unfavorable.")

Implementation of this principle requires evaluation of the remoteness, as contrasted with the proximity, of ensuing events as an ABN AMRO subsidiary, for precedent distinguishes between remote consequences of contract breach, whether favorable or unfavorable to the non-breaching party, and those that are directly related to or direct consequences of the breach. As discussed *supra*, reduction of loss through a substitute transaction is generally a direct mitigation of damages. The recapitalization of Talman by ABN AMRO was a direct consequence of the

breach, and the benefits thereof were properly credited in mitigation.

However, other transactions after Talman became an ABN AMRO subsidiary, such as the ABN AMRO-financed acquisition of other banks, and Talman's merger with another ABN AMRO bank, were commercial activity remote from the actions taken to achieve compliance with FIRREA. This activity financed by ABN AMRO was not related, either in time or in effect, to the recapitalization of Talman's lost goodwill. These subsequent investments by ABN AMRO, and the ensuing profitability and expansion of LaSalle in absorbing these acquisitions, are not properly viewed as actions in mitigation of the FIRREA-induced breach. The Court of Federal Claims erred in including the profits of all subsequent investments by ABN AMRO, as a credit against Talman's lost profits. The appropriate comparison is with the profits of the Talman bank as recapitalized with the $300 million that was required by OTS in implementation of FIRREA; these profits are the direct result of actions taken in mitigation of the breach, and are properly credited.

While LaSalle does not dispute the finding of the Court of Federal Claims that its total profits as an ABN AMRO subsidiary to the time of trial, and with discounted profits to 2012, exceed Talman's projected profits had the breach not occurred, the court did not separate the profits attributable to the initial $300 million investment and reasonably related benefits, from the entirety of LaSalle's profits as an ABN AMRO subsidiary. The record before us does not enable our determination of whether net damages may flow from such recalculation, or whether such a separation is easy to do; but we remark that when damages are hard to estimate, the burden of imprecision does not fall on the innocent party. "If a reasonable probability of damage can be clearly established, uncertainty as to the amount will not preclude recovery." *Locke v. United States,* 151 Ct.Cl. 262, 283 F.2d 521, 524 (1960) (citing *Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931)).

We vacate the decision that no damages accrued on the lost profits model, and remand for calculation of the profits attributable to the $300 million capital investment, to be credited against Talman's projected lost profits.

### III

LaSalle presents the separate argument that damages should be measured by the cost of the $300 million in replacement capital, based on dividends paid to ABN AMRO. The Court of Federal Claims stated, correctly, that "the cost of replacement capital can serve as a valid theory for measuring expectancy damages in the *Winstar* context because it provides a measure of compensation based on the cost of substituting real capital for the intangible capital held by plaintiff in the form of supervisory goodwill," and that the $300 million in equity capital was "investment capital encumbered by some expectation of payment." We agree with these statements of principle, although we conclude that this cost, as a measure of damages, is not isolated from the entirety of the costs and benefits of the recapitalization.

The government argues that the $300 million had "no cost" because "the firm receives cash worth $300 million," which is "the full value of the promise it is selling." The Court of Federal Claims correctly rejected that argument, for capital is not "costless" to either the investor or the recipient. As explained by James Van Horne & John M. Wachowicz, Jr., *Fundamentals of Financial Management*

387 (10th ed.1998), "the cost of capital is the required rate of return on various types of financing." A capital investment does not become a "gift," as the government characterizes the ABN AMRO investment, simply because the return on that investment is expected to be paid out of earnings. *See Duquesne Light Co. v. Barasch,* 488 U.S. 299, 312 n. 7, 109 S.Ct. 609, 102 L.Ed.2d 646 (1989) (return on investment may take the form of dividends, capital appreciation, or a combination thereof).

■ However, the Court of Federal Claims relied on an incorrect theory, in ruling that damages could not be based on the cost of this capital. The court found that LaSalle did not have an "enforceable" obligation to pay anything for this equity capital, as contrasted with a debt or loan at a prearranged rate. In this analysis the court erred, for the cost of capital does not depend on whether payment is made as debt, or out of anticipated future earnings. *See Federal Power Comm'n v. Hope Natural Gas Co.,* 320 U.S. 591, 603, 64 S.Ct. 281, 88 L.Ed. 333 (1944) ("the capital costs of the business ... include service on the debt and dividends on the stock") (citing *Chicago & G.T.R. Co. v. Wellman,* 143 U.S. 339, 345–46, 12 S.Ct. 400, 36 L.Ed. 176 (1892)). An investor does not make a gift when the expected payment is dividends out of future earnings. All capital raised by a corporation has a cost, *Guaranty Nat'l Ins. Co. v. Gates,* 916 F.2d 508, 515 (9th Cir.1990), and it is well established that the payment of dividends is a capital cost. *City of Los Angeles v. United States Dep't of Trans.,* 165 F.3d 972, 979 (D.C.Cir.1999).

The Court of Federal Claims thus did not reach the question of the cost of this capital. The court conducted, but did not adopt, a calculation shown in Court Exhibit 4 wherein the cost of the $300 million replacement capital was entered at the 12% hurdle rate, less 7% described as the "assumed leverage ratio." We too do not adopt this calculation, for it does not reflect the actual experience that the dividends were paid out of earnings, and that the earnings appear to have exceeded the hurdle rate as well as Talman's projected earnings but for the breach.

The government stresses that the dividends were paid to the corporate parent, and thus stayed in the corporate family. LaSalle responds that if it had borrowed the $300 million from a lender, as it tried to do, it would have had to pay for it, and that such a payment would indisputably be due to the breach. The Court of Federal Claims did not decide the effect of this parent/subsidiary relationship, and on appeal it has not been adequately briefed. Should the matter be pursued on remand, this aspect should also be considered.

In general, payment of a return on capital reflects the cost of capital. However, in determining damages the benefits of that capital must be credited, as mitigation due to the replacement of goodwill with cash. On remand the Court of Federal Claims may consider this aspect.

## IV

■ LaSalle alternatively argues that it is entitled to damages based on restitution theory. Both parties applied the law of restitution as defined in *Acme Process Equipment Co. v. United States,* 171 Ct.Cl. 324, 347 F.2d 509, 530 (1965), *rev'd on other grounds,* 385 U.S. 138, 87 S.Ct. 350, 17 L.Ed.2d 249 (1966):

[Restitution is] an alternative remedy for breach of contract in an effort to restore the innocent party to its precontract status quo, and not to prevent the unjust enrichment of the breaching party.

The Court of Federal Claims observed that *Acme* applied the theory of restitution of the first *Restatement of Contracts* § 347, *viz.* "to restore the innocent party to its pre-contract status quo." The Court of Federal Claims preferred the approach of the second *Restatement of Contracts* § 344, that the purpose of restitution is to prevent the unjust enrichment of the breaching party. We take note that this court in *Glendale*, 239 F.3d at 1379–80, did not deem these classical views incompatible, for the applicability of restitution damages varies with the particular case. *See Restatement of Restitution* § 1 cmt. e ("The amount of recovery, however, is not invariably determined by the value of what is received. In some cases the value of what is given is determinative....")

■ We consider this case on the *Acme* premise, as did the parties. When restitution damages are based on recovery of the expenditures of the non-breaching party in performance of the contract, the award can be viewed as a form of reliance damages, wherein the non-breaching party is restored to its pre-contract position by returning as damages the costs incurred in reliance on the contract. *Acme*, 347 F.2d at 530. Whether this approach to damages is viewed as restitution or as a form of *quantum meruit*, as the Court of Federal Claims preferred, both parties provided proposed measures of the costs of Talman's performance during the period from the inception of the contract in 1982 to its breach in 1989. Each side had a strikingly different view of these costs.

LaSalle's expert, Professor Christopher James, testified that the cost of performance is calculated by starting with $912,614,000, the net liabilities assumed in 1982, as the threshold cost incurred. From this cost Professor James subtracted the benefits received by the phoenix Talman thrift: the $585.6 million in cash payments and cancellation of debt received from the FSLIC, plus Talman's total earnings until the breach in 1989, adjusted for taxes and amortization of goodwill. This left a net cost of $295,143,000, which LaSalle proposed as restitution damages.

The Court of Federal Claims observed that the government obviously benefitted from Talman's assumption of the obligations of the failing thrifts, for this spared the FSLIC the liquidation cost of $912.6 million in depositor obligations. However, the court concluded that the $912.6 million of supervisory goodwill is not "a meaningful measure of plaintiff's costs" of performance, because these were not "actual costs." LaSalle disagrees, pointing out that assumed liabilities are a standard accounting cost, that Talman was obligated to pay the assumed liabilities as they became due and did so pay, and that Talman did substantially reduce these liabilities, either through payment or by sale of the underlying asset, before the breach.

However, the calculation of restitution damages based on the treatment of assumed "goodwill" liabilities as a cost of performance was generally resolved in *Glendale*, 239 F.3d at 1382–83, where this court held that damages are not properly keyed to "a liability that was at most a paper calculation." Although the assumed liabilities are indeed an accounting cost, as LaSalle stresses, we agree with the Court of Federal Claims they are not a usable measure of either cost to the thrift or benefit to the government, and thus not an appropriate threshold for restitution damages. *See also Cal. Fed. Bank*, 245 F.3d at 1351.

■ The principle of restitution damages is to return the costs incurred in performing the contract, costs sometimes conveniently measured by the benefits conferred on the breaching party; it is irrelevant whether the non-breaching party wishes to return to a previous state of affairs. However, this court resolved in

*Glendale* that the accounting rearrangement whereby net liabilities are designated a paper asset does not create a "cost" subject to restitution for full cash value, reduced only by real cash infusions and real cash profits. The trial court referred to the treatment of approximately $300 million in unrealized gains from 1982 to 1989, disputed accounting issues concerning market value and book value, and the general inapplicability of a theory that is based on returning a party to its pre-contract position.

Reviewing the issue and the arguments, we agree with the Court of Federal Claims that restitution theory does not provide a usable measure of damages for the government's breach.

### Conclusion

The judgment of liability, and the uncontested award of $5,008,700, are affirmed. We affirm the principle that LaSalle's earnings due to remedial actions after the breach are properly credited in determining damages. We remand for further proceedings, consistent with this opinion.

*AFFIRMED IN PART, VACATED IN PART AND REMANDED.*