# United States Court of Appeals for the Federal Circuit

2008-5075, -5077

REPUBLIC SAVINGS BANK, F.S.B.,
REPUBLIC HOLDING COMPANY,
MCB FINANCIAL GROUP, INC.,
and MEADOWS RESOURCES, INC.,

Plaintiffs-Cross Appellants,

and

PUBLIC SERVICE COMPANY OF NEW MEXICO,

Plaintiff,

v.

UNITED STATES,

Defendant-Appellant.

Christopher T. Handman, Hogan & Hartson LLP, of Washington, DC, argued for plaintiffs-cross appellants.  With him on the brief were David J. Hensler and Liana G.T. Wolf.

Jeanne E. Davidson, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellant.  With her on the brief were Michael F. Hertz, Deputy Assistant Attorney General, Kenneth M. Dintzer, Assistant Director, Scott D. Austin, Senior Trial Attorney, and Elizabeth A. Holt and Amanda Tantum, Trial Attorneys.  Of counsel were William G. Kanellis and Sameer P. Yerawadekar, Trial Attorneys.

Appealed from:  United States Court of Federal Claims

Senior Judge Loren A. Smith

# United States Court of Appeals for the Federal Circuit

2008-5075, -5077

REPUBLIC SAVINGS BANK, F.S.B.,
REPUBLIC HOLDING COMPANY,
MCB FINANCIAL GROUP, INC., and
MEADOWS RESOURCES, INC.,

                        Plaintiffs-Cross Appellants,

and

PUBLIC SERVICE COMPANY OF NEW MEXICO,

                        Plaintiff,

v.

UNITED STATES,

                        Defendant-Appellant.

Appeal from the United States Court of Federal Claims in 92-CV-265,
Senior Judge Loren A. Smith.

_____

DECIDED: October 21, 2009

_____

Before LOURIE, CLEVENGER, and SCHALL, <u>Circuit Judges.</u>

CLEVENGER, <u>Circuit Judge</u>.

The United States ("government") appeals from the final decision of the Court of Federal Claims in which the court summarily awarded plaintiffs Republic Savings Bank, F.S.B. ("RSB"), Republic Holding Company, Inc. ("RHC"), and MCB Financial Group,

Inc. ("MCB") (together, "Plaintiffs"[1]) $14,641,059.29 in restitution damages for their breach of contract claim against the government. Republic Sav. Bank, FSB v. United States, 80 Fed. Cl. 295 (2008). For the reasons set forth below, we affirm in part and reverse in part the award. We therefore vacate the judgment and remand for further proceedings consistent with this opinion.

I

This is a Winstar case that comes out of the savings and loan crisis of the early 1980s. As the Supreme Court explained in United States v. Winstar Corp., 518 U.S. 839, 843-58 (1996), during this period rising interest rates triggered widespread insolvency in the savings and loan association industry. With failed institutions piling up and bailout money running low, the federal government began offering incentives to encourage private investors to take over the failing institutions through supervisory merger transactions. Id.

This particular case goes back to 1985 when the government began soliciting bids for the takeover of two failing thrifts, Citizens Federal Savings and Loan Association of Matteson, Illinois ("Citizens") and Fireside Federal Savings and Loan Association of Cicero, Illinois ("Fireside"). By encouraging private investors to take over the two institutions, the government stood to save nearly $30 million in liquidation costs, according to regulators' estimates. The winning bid came from investors Douglas Crocker and Robert Bobb. To effectuate the takeover, Crocker and Bobb formed a holding company, RHC, with MCB as its sole shareholder. MCB, in turn, was owned

---

[1] Throughout this opinion, we use the term "Plaintiffs" for simplicity, but note that plaintiff RSB did not pledge an ownership stake, but instead was the recipient of the interests that one or more of the other plaintiffs contributed.

equally by Meadows Resources, Inc., ("Meadows") and a voting trust controlled by Crocker and Bobb. Meadows, MCB, and RHC are subsidiaries of Public Service Corporation of New Mexico.

On August 30, 1985, RHC purchased the failing thrifts and merged them into a new savings and loan association, RSB. The Federal Home Loan Bank Board ("FHLBB") formally approved the supervisory transaction in Resolution No. 85-773. Specific terms of the transaction were set forth in a number of documents, including the Assistance Agreement and the Net Worth Stipulation. Pursuant to the investors' agreement with the government, in exchange for one hundred percent of RHC's stock, MCB would capitalize RHC by contributing a $5 million equity interest in Bellamah Community Development ("BCD"), a real estate development partnership owned by Meadows and MCB. This equity interest represented 1.74 percent of BCD's total ownership interest. Next, the investors pledged a $12 million earnings preference on BCD's future earnings. The earnings preference was structured to accrue ten percent annual interest on any unpaid portion. The government provided the remaining $3 million capitalization in cash, bringing RSB's total capitalization to $20 million.

Pursuant to their agreement with the government, plaintiffs Meadows, MCB, and RHC also agreed to maintain RSB's net worth above certain specified thresholds. On the other side, the government would permit RSB to use the "purchase method" of accounting, under which RSB could designate the excess of the thrifts' purchase price over the fair value of the acquired assets as "goodwill." This goodwill could then be applied toward meeting the government's regulatory capital requirements.

RSB faced a different set of capital standards, however, after August 9, 1989, when Congress enacted the Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA"), Pub. L. No. 101-73, 103 Stat. 183. The statute obligated the newly formed Office of Thrift Supervision ("OTS") to "prescribe and maintain uniformly applicable capital standards for savings associations," in accord with new statutory requirements. 12 U.S.C. § 1464(t)(1)(A). OTS promptly implemented new standards. Although RSB had maintained compliance with the capital standards set forth in its agreement with the government, it could not comply with OTS's new standards. Due to RSB's noncompliance, the government, through the Resolution Trust Corporation ("RTC"), seized RSB on June 5, 1992, and placed the institution in a conservatorship. Three months later, RTC sold RSB to Regency Savings Bank for $926,000. After the sale, RSB remained as a receivership, administered first by the RTC and then, upon the RTC's dissolution, by the Federal Deposit Insurance Corporation ("FDIC"). By the time the government was done paying administrative expenses associated with the receivership, only $284,940.71 from the original $926,000 sale remained. In October 2004, the FDIC paid this $284,940.71 to Meadows, an owner of RSB's preferred stock, as the final distribution of the RSB receivership.

In June 1992, Plaintiffs filed a complaint against the government alleging, among other things, breach of contract. Plaintiffs sought restitution for the $17 million capital contribution to RSB and for $926,000 in alleged "profit" that the government received from selling RSB. In Republic Sav. Bank, FSB v. United States, 80 Fed. Cl. 295, 296-97 (2008), the United States Court of Federal Claims ruled on summary judgment that a contract existed between Plaintiffs and the government and that through the enactment

of FIRREA and its implementing regulations, the government breached the contract. Id. at 302. With respect to damages, the trial court summarily awarded Plaintiffs $14,641,059.29 in restitution, consisting of (1) $17 million for MCB's initial capital contribution, offset by $3 million to account for the government's cash contribution; and (2) $641,059.29, the difference between RSB's $926,000 sale price and the amount the FDIC returned to Meadows, as an owner of RSB's preferred stock. Id. at 302-03, 305.

II

Although the government now concedes liability, it challenges the amount of the restitution award. The government asserts that Plaintiffs' alleged $17 million contribution was a mere accounting entry that did not reflect the pledged assets' real value, and therefore was not a proper basis for restitution. As it turned out, beginning as early as 1988, BCD suffered severe financial losses, and ultimately filed for bankruptcy. As a result, RSB wrote off the entire BCD investment, having collected only $2.235 million from the $12 million earnings preference, and nothing from the $5 million equity interest. The government asks this court to limit Plaintiffs' restitution award to the $2.235 million that the pledged assets actually produced.

The government also alleges that the trial court erred by refusing to offset Plaintiffs' restitution award with the tax benefits Plaintiffs received when they took over the two failing thrifts. Finally, the government asserts that the trial court erred by awarding restitution based on the $926,000 sale premium, a benefit that Plaintiffs did not confer, and one that the government did not receive. On cross appeal, Plaintiffs contend that the court should not have offset the award with the government's $3 million initial contribution. We have jurisdiction over this appeal under 28 U.S.C. § 1295(a)(3).

III

We review a grant of summary judgment <u>de novo</u>. <u>Am. Capital Corp. v. United States</u>, 472 F.3d 859, 865 (Fed. Cir. 2006). Contract interpretation is a question of law, also reviewed <u>de novo</u>. <u>Castle v. United States</u>, 301 F.3d 1328, 1337 (Fed. Cir. 2002). The value of a restitution claim, however, is an issue of fact. <u>Hansen Bancorp, Inc. v. United States</u>, 367 F.3d 1297, 1316 (Fed. Cir. 2004). Thus, summary judgment of a restitution award is only proper when, viewing the evidence in the light most favorable to the nonmovant, the record indicates that there is no genuine issue as to the measure of the award. <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). However, once a moving party satisfies its initial burden, mere allegations of a genuine issue of material fact without supporting evidence will not prevent entry of summary judgment. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986).

IV

This court has explained that restitution may be measured by either "the value of the benefits received by the defendant due to the plaintiff's performance," or "the cost of the plaintiff's performance, which includes both the value of the benefits provided to the defendant and the plaintiff's other costs incurred as a result of its performance under the contract." <u>Landmark Land Co. v. FDIC</u>, 256 F.3d 1365, 1372 (Fed. Cir. 2001). We use the reasonable market value of the benefits, measured at the time of performance. <u>Hansen</u>, 367 F.3d at 1314-15. However, the non-breaching party's compensation is limited to "the <u>net</u> loss that results from the defendant's breach." <u>Id.</u> at 1315. We must, therefore, offset Plaintiffs' award "by the value of any benefits that [they] received from the defendant under the contract, so that only the actual, or net, loss is compensated."

_Landmark_, 256 F.3d at 1373. Last, "if the value of the benefit conferred upon the breaching party is not ascertainable through some usable measure of damages, restitution may not be possible." _Hansen_, 367 F.3d at 1315.

A

The government challenges the trial court's $17 million valuation for Plaintiffs' contribution to RSB's initial capitalization. First, the government argues that the $5 million equity interest and $12 million earnings preference were so ephemeral as to be incapable of valuation, as a matter of law. For this argument, the government relies on _LaSalle Talman Bank, F.S.B. v. United States_, 317 F.3d 1363 (Fed. Cir. 2003), and _Glendale Federal Bank, FSB v. United States_, 239 F.3d 1374 (Fed. Cir. 2001), two cases in which we denied reliance damages for liquidation costs purportedly avoided by the government because the alleged avoided costs were too speculative and indeterminate to be a usable measure for restitution. _See_ _LaSalle_, 317 F.3d at 1376; _Glendale_, 239 F.3d at 1382.

Next, the government asserts that as a matter of law, the time to value Plaintiffs' capital contribution was well after the takeover transaction took place. For this, the government relies on _Westfed Holdings, Inc. v. United States_, 407 F.3d 1352, 1368-69 (Fed. Cir. 2005), a case in which we denied recovery for a plaintiff's alleged reliance damages based on payments-in-kind ("PIKs") that the plaintiff had provided instead of cash when interest payments came due on existing debentures. Because these PIKs were mere "potential future obligations" that "may or may not come due in the future," the plaintiff had not yet sustained "an actual loss as a result of the government's breach," and therefore could not collect restitution based on the PIKs. _Id._ The

government insists that Plaintiffs' contributions in this case were likewise mere contingent future obligations, and that Plaintiffs' actual losses were limited to the $2.235 million in cash that MCB actually distributed to RSB. The government asserts that the trial court should have limited restitution to these actual losses. The government is wrong on both points.

Generally, a party who is liable in restitution must pay for any benefits that the non-breaching party has conferred under the contract. Landmark, 256 F.3d at 1372. While the government is correct that in certain cases, restitution is not possible when "the value of the benefit conferred upon the breaching party is not ascertainable through some usable measure of damages," Hansen, 367 F.3d at 1315 (citing LaSalle, 317 F.3d at 1376-77), Plaintiffs' initial contributions were sufficiently measurable and concrete. Unlike the plaintiffs in LaSalle and Glendale, Plaintiffs are not pursuing restitution based on a "speculative and indeterminate" amount that they saved the government by taking over the failing thrifts. Glendale, 239 F.3d at 1382; see also LaSalle, 317 F.3d at 1376. Instead, Plaintiffs pledged an ownership stake in an existing commercial entity, along with rights to a proven earnings stream, backed by interest. These are real assets with an objective worth and are therefore clearly recoverable. See Hansen, 367 F.3d at 1317 n.14 (finding that plaintiff's initial stock contribution was "an asset with a monetary value, just like cash," and was therefore compensable in restitution); Landmark, 256 F.3d at 1382 (affirming restitution for the full value of plaintiff's contribution of real estate and cash).

The government is also wrong that this court should limit restitution to the amount of income that the assets ultimately produced. Plaintiffs are entitled to restitution for the

value of the benefits they conferred on the government, measured at the time of performance. Hansen, 367 F.3d at 1314-15; Arizona v. United States, 575 F.2d 855, 865 (Ct. Cl. 1978). The government's reliance on Westfed is misplaced. In Westfed, the unrecoverable PIKs merely obligated the plaintiffs to prospectively "take on future payment obligations, which may or may not come due in the future." 407 F.3d at 1369. Here, in contrast, Plaintiffs conveyed an ownership interest in an existing, profitable partnership, along with rights to the partnership's earnings stream, backed by interest. They conveyed these concrete assets at the time of contracting; we must therefore likewise value the assets at that point. Likewise, the government's performance came at the time of contracting when the government put up its $3 million contribution and assured the tax consequences bargained for by the investors.

In its reply brief to this court, the government suggests, for the first time, that if it is wrong on its two legal theories (which it is), we should remand the case for trial for proper valuation of the $17 million capital contribution. According to the government, the trial court was wrong to determine damages on summary judgment because there is a material factual dispute as to the value of Plaintiffs' contribution at the time of contracting. We disagree.

The government's own analysis at the time of contracting confirmed the assets' $17 million value. Leo Blaber, the former President of the FHLB-Chicago and Principal Supervisory Agent for the FHLBB, explicitly stated that "it is our position that the infusion, as it has been described to us, will result in $17 million of net worth for Republic Savings." Mem. from Leo Blaber, Principal Supervisory Agent, to FHLBB, J.A. 100312. Indeed, the government does not deny that it consistently and repeatedly

approved Plaintiffs' pledges as sufficient to cover $17 million in capitalization. Instead, the government insists that its approval was a mere "accounting entry" that "cannot be conflated with a 'valuation.'" Government's Br. at 31. However, nothing in the record indicates that any of the parties involved understood the alleged accounting entry to be something other than a real valuation.

The government's willingness to approve the deal was not the rubber stamp the government makes it out to be. Rather, when regulators were unsatisfied with Plaintiffs' proposed pledges, they negotiated better terms. For example, when the government's Supervisory Agent expressed concern about valuing the $12 million earnings preference at $12 million, Plaintiffs agreed to add an interest term. See File Notes from Supervisory Analyst Chip G. Kiesewetter, pp. 2-3, J.A. 100277-78 (describing negotiations during an Aug. 23, 1985 meeting between the investors and the FHLBB). These negotiations indicate that the government took an active role in ensuring that the pledged assets measured up to the established capital requirements.

In light of the government's arms-length negotiations and express approval of the deal, its mere allegation that there is a material factual dispute as to the assets' value is not enough to preclude summary judgment. The government has not—either below or on appeal—pointed to any record evidence that might put the $17 million valuation in doubt, and the government cannot now collect new evidence because it did not appeal the trial court's order closing discovery. Under these circumstances, we see nothing to preclude the Court of Federal Claims from summarily valuing the initial contribution at $17 million. See T & M Distribs. v. United States, 185 F.3d 1279, 1285 (Fed. Cir. 1999) ("The Court of Federal Claims was not obliged to deny summary judgment merely to

satisfy a speculative hope on [appellant's] part of finding some evidence that might tend to support a claim"). Indeed, in opposing Plaintiffs' summary judgment motion for restitution, the government was obligated to "do more than merely raise some doubt as to the existence of a fact; evidence must be forthcoming from the nonmovant which would be sufficient to require submission to the [fact-finder] of the dispute over the fact." Copelands' Enters., Inc. v. CNV, Inc., 945 F.2d 1563, 1566 (Fed. Cir. 1991) (quoting Avia Group Int'l, Inc. v. L.A. Gear Cal., Inc., 853 F.2d 1557, 1560 (Fed. Cir. 1988)). The government's challenge to the restitution award of $17 million for the Plaintiffs' capital contribution is rejected.

B

Next, the government contends that the trial court erred by including, as part of the restitution award, the $641,059.29 that the government had not returned to Plaintiffs from RSB's $926,000 sale premium. In response, Plaintiffs defend the award as necessary to prevent the government's unjust enrichment. According to Plaintiffs, the government should not reap the benefits of Plaintiffs' efforts in managing RSB, efforts that ultimately transformed the two banks from a $30 million plus government liability into a near $1 million asset.

We agree with the government that the Plaintiffs were not entitled to restitution for the sale premium. "The idea behind restitution is to restore—that is, to restore the non-breaching party to the position he would have been in had there never been a contract to breach." Glendale, 239 F.3d at 1380. Unlike expectation damages, restitution does not put the plaintiff in his post-contract position. See LaSalle, 317 F.3d at 1363, 1371, 1376 (explaining that expectation damages are the benefits that the non-

breaching party "would have received had the contract been performed," whereas restitution damages "restore the innocent party to its pre-contract status quo"); Acme Process Equip. Co. v. United States, 347 F.2d 509, 528 (Ct. Cl. 1965) ("[Restitution's] purpose is to restore the injured party to the pre-contract status quo, not to put him in his post-contract position."). Here, undoing Plaintiffs' agreement with the government also undoes any expectation of profits from RSB's sale. Restitution demands unwinding the whole contract; we cannot unwind Plaintiffs' initial capital contributions without also unwinding their claim to RSB's sale premium.

The alleged unjust enrichment cannot by itself justify augmenting the restitution award. As we have noted, "[Restitution is] an alternative remedy for breach of contract in an effort to restore the innocent party to its pre-contract status quo, and not to prevent the unjust enrichment of the breaching party." LaSalle, 317 F.3d at 1376 (quoting Acme, 347 F.2d at 528) (alteration in original). Although it may be helpful to look to the value of the benefits to the breaching party when determining restitution, the point of doing so is ultimately to measure the plaintiff's costs. See LaSalle, 317 F.3d at 1376 ("The principle of restitution damages is to return the costs incurred in performing the contract, costs sometimes conveniently measured by the benefits conferred on the breaching party."). Although Plaintiffs made some general statements about their efforts in turning around the failing thrifts, they have not tried to tie their specific performance costs to the $926,000 sale premium. Nor could they. For even if we assume that Plaintiffs' efforts in turning the failing thrifts into a profitable asset were theoretically compensable in restitution, the $926,000 sale premium would not be the proper measure of that compensation. Were the court to compensate Plaintiffs for their

efforts, the more logical measure would be the difference between RSB's value when Plaintiffs acquired the failing thrifts—an alleged $30 million plus liability that the government avoided—and the $926,000 sale price. However, this court has repeatedly rejected the notion that the government's alleged avoided liquidation costs are an appropriate basis for a restitution award. See Granite Mgmt. Corp. v. United States, 416 F.3d 1373, 1380-81 (Fed. Cir. 2005) (citing cases). The sale premium was not a valid basis for restitution and the court erred by including the net sale premium in Plaintiffs' award.[2]

C

The government next contends that Plaintiffs' restitution award should have been offset by the $4.287 million in tax benefits that Plaintiffs received by using Citizens' and Fireside's pre-merger net operating losses ("NOLs") to offset other partnership income. According to the government, such an offset is necessary given that restitution is meant only to restore Plaintiffs to their pre-contract position. We agree and hold that the trial court erred by not reducing the award by the value of the tax benefits.

When calculating restitution, we must offset the Plaintiffs' award "by the value of any benefits that [Plaintiffs] received from the defendant under the contract, so that only the actual, or net, loss is compensated." Landmark, 256 F.3d at 1373. Plaintiffs do not dispute that they saved $4.287 million in taxes by taking advantage of the NOLs. However, Plaintiffs contend that the tax savings should not reduce their award because the benefit did not come directly from the government pursuant to a requirement in the

---

[2] The proper measure of restitution has no bearing, of course, on any statutory obligation the government had to return the $284,940.71 that remained after it had paid the receivership expenses.

contract. Plaintiffs cite Landmark and Hansen, two cases in which we refused to offset plaintiffs' awards with post-contract dividends from the thrift because "[t]he government's actions were simply not relevant to the dividends, which were generated as a result of [the non breaching party's] performance under the contract in managing [the bank]." Landmark, 256 F.3d at 1373-74; see also Hansen, 367 F.3d at 315-16. Plaintiffs assert that "[the] NOLs and their ability to offset income did not exist by dint of anything the Government did under the terms of the parties' contract." Pls.' Br. at 42. However, Plaintiffs' negotiations with the government tell a different story.

The tax benefits were not some remote consequence of the contract in which the government took no part. Plaintiffs do not deny that from the beginning, the tax benefits were a crucial motivating force behind their willingness to take over the two failing thrifts. However, Plaintiffs had to request special authorization from the FHLBB to gain access to the tax benefits. As the FHLBB's Supervisory Agent explained in his recommendation, Plaintiffs requested this authorization because, before they could take advantage of the NOLs, the FHLBB had to exercise its statutory authority under section 408(m) of the National Housing Act to override existing federal laws that would not normally permit federal savings institutions like RSB to hold an interest in partnerships. See Issues Mem. from Leo Blaber, Principal Supervisory Agent, to FHLBB, J.A. 100293 (explaining that because "[s]ection 5(c) of [Home Owners' Loan Act of 1933] does not authorize federal associations to invest in a partnership interest," Plaintiffs requested that "the Bank Board utilize its authority under [the National Housing Act,] section 408(m) to override any provisions of federal law which might prohibit the contemplated infusion"). The regulators ultimately agreed to Plaintiffs' request and, as part of its

resolution formally approving Plaintiffs' supervisory transaction, the FHLBB specifically "approve[d] . . . the contribution to Republic Savings of the BHL Interest by Republic Holding, pursuant to § 408(m) of the [National Housing] Act."  FHLBB Resolution No. 85-773, Acquisition of Citizens Federal Savings and Loan Ass'n of Matteson and Fireside Fed. Sav. & Loan Ass'n (Aug. 30, 1985), J.A. 100342-43.  The short of this matter is: (1) the investors would not do the deal without assurance that the partnership interest would be held by RSB; (2) the regulators made a special exception in law to allow the desired result; and (3) the investors' offer to do the deal on this condition was accepted by the government, with good and valuable consideration going both ways. Indeed, that Plaintiffs raised the tax issue in negotiations at all suggests a tie between the benefit and government's performance under the contract.  See Restatement (Second) of Contracts § 202(5) (1981) (noting the import of the parties' course of performance and course of dealing to an agreement).  Under these circumstances, we cannot conclude that the government's actions were irrelevant to the tax benefit.

As we stated in Bluebonnet Savings Bank, F.S.B. v. United States, "the non-breaching party should not be placed in a better position through the award of damages than if there had been no breach."  339 F.3d 1341, 1345 (Fed. Cir. 2003).  Yet the Court of Federal Claims did just that when it allowed Plaintiffs to keep the full value of the tax benefits that, as the parties' negotiations reflect, were a direct, immediate benefit of Plaintiffs' transaction with the government.  On remand, the Court of Federal Claims should offset Plaintiffs' restitution award by the uncontested $4.287 million in tax benefits.

2008-5075, -5077                    15

D

As we have already noted, a restitution award "must be reduced by the value of any benefits that [Plaintiffs] received from the defendant under the contract." Landmark, 256 F.3d at 1373. On cross appeal, Plaintiffs contend that the trial court erred by offsetting their restitution award with the government's $3 million cash contribution. According to Plaintiffs, "the Government did not contribute $3 million to the Plaintiffs," but rather "to a third-party savings institution." Pls.' Br. at 6. However, RSB was a signatory to the contract and was clearly a named plaintiff in this case.[3] In addition, the government's contribution also indirectly benefited the non-RSB plaintiffs. The $3 million cash contribution was necessary to meet the government's mandate for $20 million in initial capitalization and, had the government not made the contribution, Plaintiffs would have been left to cover the deficiency. In this way, even putting aside the direct benefit to plaintiff RSB, the other plaintiffs clearly benefited from the government's cash contribution. The trial court therefore did not err in offsetting Plaintiffs' award correspondingly.

V

For the foregoing reasons, we affirm in part and reverse in part. We vacate the judgment and remand for further proceedings consistent with this opinion.

COSTS

No costs.

AFFIRMED IN PART, REVERSED IN PART, VACATED, AND REMANDED

---

[3] It was no accident that Plaintiffs named RSB as a co-plaintiff. Rather, as Plaintiffs admit, it was a litigation tactic to facilitate augmenting Plaintiffs' restitution award with the $926,000 sale premium. See Pls.' Reply Br. at 4 n.1.