**AMERICAN FEDERAL BANK, FSB, Plaintiff,**

v.

**UNITED STATES, Defendant.**

No. 95–498C.

United States Court of Federal Claims.

Oct. 31, 2005.

348

Howard N. Cayne, Arnold & Porter, LLP, Washington, D.C., argued for plaintiff. With him on the briefs were David B. Bergman, Michael A. Johnson, Michael A. Sackey, and Joshua P. Wilson, Arnold & Porter LLP, Washington, D.C.

John N. Kane, Trial Attorney, and Sameer Yerawadekar, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., argued for defendant. With them on the briefs were Stuart E. Schiffer, Deputy Assistant Attorney General, David M. Cohen, Director, Commercial Litigation Branch, Jeanne E. Davidson, Deputy Director, and Timothy Abraham, Mark Pittman, and Edward E. Sullivan, Trial Attorneys, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C.

## OPINION AND ORDER

LETTOW, Judge.

This *Winstar*-related case [1] is before the court on cross-motions for summary judgment on damages. The government's liability for breach of contract has been established following a trial. *American Fed. Bank, FSB v. United States*, 62 Fed.Cl. 185 (2004). For the reasons that follow, the court finds that summary judgment on damages in plaintiff's favor is not appropriate. Genuine issues of material fact exist regarding the cost of replacement capital, certain incidental losses, and a tax "gross-up." The government's motion as to those claims correspondingly is also denied and those claims are remitted to trial. The government is,

---

1. *See United States v. Winstar Corp.*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996).

however, granted summary judgment respecting plaintiff's claims for damages based upon a lost-profits expectancy theory and upon a reliance theory, and for incidental losses based upon an alleged increased cost of funds.

## BACKGROUND [2]

American Federal Bank, FSB ("American Federal") was a federally chartered savings and loan association based in Greenville, South Carolina. *American Federal*, 62 Fed. Cl. at 186. Over a thirty-seven day period in 1982, American Federal received approval from the Federal Home Loan Bank Board ("FHLBB" or "Bank Board") to acquire four troubled thrifts: United Federal Savings and Loan Association, Home Savings and Loan Association, Family Federal Savings and Loan Association, and Bell Federal Savings and Loan Association, each of which was located in South Carolina. *Id.* at 186–87. At the time, American Federal had a net regulatory book value of $15.488 million that was 4.4% of its assets. *Id.* at 189.

As part of the agreed arrangements with the Bank Board for the mergers, American Federal was able to use the purchase method of accounting, count as regulatory capital the intangible goodwill that was produced as a result of the mergers, and amortize that goodwill over a forty-year period. *American Federal*, 62 Fed.Cl. at 187.[3] In total, American Federal recorded $61,158,716 of amortizing goodwill from these four acquisitions. *See* Appendix in Support of Plaintiff's Response to Defendant's Motion for Summary Judgment Upon Damages and Cross–Motion for Partial Summary Judgment on Damages ("Pl.'s App.") tab 3 (Consolidated Financial Statements (1983 & 1982)), at 6–7. After a trial on liability issues, this court found that plaintiff entered into implied-in-fact contracts with the Bank Board concerning all four mergers. *American Federal*, 62 Fed.Cl. at 205. From the Bank Board's approval of the mergers until October 1988, American Federal amortized its goodwill in accordance with the agreed forty-year schedule and recorded it as part of the bank's regulatory capital. Stipulations ¶¶ 118–19; *American Federal*, 62 Fed.Cl. at 199 (finding that American Federal implemented its four contracts with the government regarding the amortization of goodwill through and to the time the bank's application for a modified stock conversion was approved).

On September 6, 1988, American Federal applied to the Bank Board for approval for a modified stock conversion. Appendix to Defendant's Motion for Summary Judgment on Damages and Defendant's Proposed Findings of Uncontroverted Fact ("Def.'s App.") at A–603 to A–606 (Letter from John F. Breyer, Jr., Housley Goldberg & Kantarian, to J. Lawrence Fleck, FHLBB (Sept. 6, 1988)); *see* 12 C.F.R. §§ 563b.39, 563b.41 (1988).[4] In reviewing the conversion application, the "most significant issue" for the Bank Board was the continued use of the purchase method of accounting and forty-

---

**2.** The recitations that follow do not constitute findings of fact. Instead, the recitals are taken from this court's prior ruling on liability following trial and from the parties' submissions regarding the pending cross-motions. The recited circumstances are undisputed except when a contrary indication is noted.

**3.** Beginning in September 1981, through the issuance of Memorandum R–31b, the Bank Board allowed thrifts to use the purchase method of accounting when merging with weak or failing thrifts. *See American Federal*, 62 Fed.Cl. at 187; Stipulations of Fact (May 6, 2004) ("Stipulations") ¶¶ 21–22. In particular, acquiring thrifts could classify as "goodwill" the amount by which assumed liabilities exceeded the net fair market value of the acquired assets. *American Federal*, 62 Fed.Cl. at 187. This goodwill would then be recorded as an intangible asset for pur-

poses of regulatory capital and could be applied to the acquiring thrifts' regulatory net-worth requirement. *Id.* (citing 12 C.F.R. § 563.13 (1981)). The acquiring thrift could amortize the amount of goodwill for a period of up to forty years. *Id.;* Stipulations ¶ 21.

**4.** Generally, a modified stock conversion was available to institutions that did not meet their regulatory capital requirement; in those circumstances, a standard stock conversion was "not feasible." 12 C.F.R. § 563b.35 (1988). Under the Bank Board's then-existing rules, modified stock conversions could "be effected without the approval of members, must involve sales of conversion stock at an aggregate price in excess of the *pro forma* market value of the institution as determined by an independent appraiser, and [must] involve the limitation of members' preemptive rights." *Id.*

year amortization period for the goodwill attributable to the mergers that occurred in 1982. *American Federal*, 62 Fed.Cl. at 193 (quoting trial transcript). Ultimately, the parties negotiated new terms whereby the goodwill would be amortized over a remaining period of 23.25 years to begin October 1, 1988, *i.e.*, 29.5 years dating from the time of the approval of the four mergers. Pl.'s App. tab 6 (1989 Annual Report), at 28. With this agreement, the Bank Board conditionally approved American Federal's application on November 10, 1988, Def.'s App. at A–618 to A–619 (Letter from Fleck to Breyer (Nov. 10, 1988)), resulting in the formation of a substituted contract for goodwill that discharged the four prior merger contracts ("Substituted Goodwill Contract"). *American Federal*, 62 Fed.Cl. at 199–203.

American Federal also filed, in conjunction with the conversion application, a request to include as part of its regulatory capital $100,000 of Series A subordinated debentures and approximately $13.5 million of Series B subordinated debentures, both of which were to be issued and sold as part of the modified conversion. Def.'s App. at A–761 (Memorandum from Kim R. Scheurenbrand, Supervisory Agent, Federal Home Loan Bank of Atlanta ("FHLB–Atlanta"), to Robert E. Showfety, Principal Supervisory Agent, FHLB–Atlanta (Dec. 20, 1988)). Following a positive recommendation made by FHLB–Atlanta on the ground that the bank's proposal would allow it to meet its minimum capital requirement, the Bank Board approved this further application by American Federal on December 23, 1988. *American Federal*, 62 Fed.Cl. at 193–94. The Bank Board's action created an additional contract between American Federal and the government ("Subordinated Debt Contract"). *Id.* at 203–205.

On January 26, 1989, American Federal completed its modified stock conversion, generating $10.0 million in gross proceeds through the sale of 2 million shares. Def.'s App. at A–771 (Form 10–K (1988)). From those proceeds, "$2.0 million was allocated to common stock and $6.3 million, which is net of [c]onversion costs of $1.7 million, was allocated to additional paid-in capital." *Id.*

In addition, American Federal "sold $100,000 aggregate principal amount of non-interest-bearing Series A convertible subordinated debentures due 2004, with nondetachable mandatory purchase contracts for an aggregate purchase price of $12.5 million, which include[d] a $12.4 million conversion premium." *Id.* at A–772 (Form 10–K (1988)). Finally, the bank also sold $15 million aggregate principal amount of Series B subordinated debentures, with detachable warrants to purchase 600,000 shares of common stock at $5.00 per share, at an interest rate of 11.25% and due in 1999. *Id.* In total, American Federal increased its regulatory capital by $35.557 million, Def.'s App. at A–790 (Office of Thrift Supervision ("OTS") Report of Examination (Sept. 12, 1989)), reporting a total of $59.1 million in regulatory capital subsequent to the conversion, $27.1 million over its capital requirement. Def.'s App. at A–772 (Form 10–K (1988)).

On August 9, 1989, Congress enacted the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA"), Pub.L. No. 101–73, 103 Stat. 183 (codified in scattered sections of Title 12 of the U.S.Code, including 12 U.S.C. § 1464) that eliminated the use of goodwill as a component of regulatory capital and restricted the use of subordinated debt as part of core capital. OTS, the Bank Board's successor under FIRREA, announced the regulations implementing FIRREA's new capital requirements on October 27, 1989, to be effective on December 7, 1989. 54 Fed.Reg. 46,845 (Nov. 8, 1989) (codified at 12 C.F.R. pts. 561, 563 and 567). The passage of FIRREA breached the government's two existing contracts with American Federal as of the effective date of FIRREA's implementing regulations: namely, (1) its substituted contract concerning the treatment of goodwill, and (2) its contract permitting newly issued subordinated debt to be counted as regulatory capital. *American Federal*, 62 Fed.Cl. at 205.

At the time of FIRREA's implementation, and thus when the government breached its contracts with American Federal, the bank had $48.702 million of unamortized goodwill and $13.6 million of subordinated debentures,

recorded as regulatory capital. Pl.'s App. tab 6 (1989 Annual Report), at 35, 37. Following OTS's implementation of FIRREA's new capital requirements, the bank needed $15.987 million of tangible capital, $31.974 million of core capital, and $49.788 million of risk-based capital. *Id.* at 37. American Federal immediately failed the tangible– and core-capital requirements with deficiencies of $28.836 million for each, and it failed the risk-based capital requirement by $43.512 million. *Id.; see also American Federal,* 62 Fed.Cl. at 194.

FIRREA required that institutions such as American Federal that did not meet the new capital requirements had to file a capital plan with OTS detailing how they planned to become fully compliant with all capital requirements by December 31, 1994. Pl.'s App. tab 8 (Thrift Bulletin 36), at 1–2; *see* 12 U.S.C. § 1464(t)(6); *see also* Pl.'s App. tab 9 (Letter from John E. Ryan, District Director, OTS, to Board of Directors (Nov. 15, 1989)). On January 8, 1990, American Federal filed a capital plan with OTS describing how the bank would meet its capital requirements by the prescribed deadline. Def.'s App. at A–833 to A–867 (Capital Plan), A–1463 (Letter from J. Laurence Sykes, Supervisory Agent, OTS, to William L. Abercrombie, Jr., President, American Federal (Jan. 10, 1990)) (acknowledging receipt of the capital plan and commencement of OTS's review). Following the submission of two amendments to the capital plan by American Federal, Pl.'s App. tab 20 (Capital Plan 1st Amendment (Mar. 8, 1990)); Pl.'s App. tab 22 (Capital Plan 2nd Amendment (May 18, 1990)), OTS approved the plan subject to stated conditions. Pl.'s App. tab 24 (Letter from Ryan to Board of Directors (May 31, 1990)).

"The principal components of the capital plan include[d] retention of future earnings, reduction of non-qualifying assets and securitization of mortgage loans into mortgage-backed securities." Pl.'s App. tab 12 (1990 Annual Report), at 21. On April 17, 1990, as part of the capital plan, American Federal undertook and completed the conversion of the Series B subordinated debentures into $15.0 million of non-cumulative preferred stock ("Series I preferred stock"). *Id.* at 38. The detachable warrants associated with the Series B debentures were not affected by this conversion. *Id.* The conversion added $13.7 million in equity capital for American Federal. Def.'s App. at A–1668 (Press Release (Mar. 20, 1990)). Although the bank was still unable to comply with the minimum capital requirements for 1990, having a risk-based capital deficiency of $25.202 million, it did surpass its capital plan's risk-based capital target of $26.845 million or 3.50% by $3.680 million or 0.44%. Pl.'s App. tab 12 (1990 Annual Report), at 21–22.

Pursuant to its capital plan and to reduce further the bank's "risk-based capital requirements and provide a source of liquidity," American Federal converted many of its residential mortgage loans into mortgage-backed securities. Pl.'s App. tab 48 (Offering Circular (Mar. 12, 1993)), at 34–35. During the years 1990, 1991, and 1992 the bank securitized loans of $47.918 million, $55.634 million, and $48.891 million, respectively. *Id.* at 35. It sold some of the resulting mortgage-backed securities in 1991 and 1992, realizing net proceeds of $3.6 million over those two years. Pl.'s App. tab 46 (1993 Annual Report), at 29.

The steps American Federal took under its conditionally approved capital plan produced a steady improvement in its capital structure. By September 30, 1992, for the first time since the passage of FIRREA, American Federal had satisfied all of its then-applicable minimum capital requirements.[5] Def.'s App. at A–1965 (Form 10–Q (Sept. 30, 1992)), A–2010 (Form 10–K (1992)). During the period from December 31, 1989 to December 31, 1992, American Federal increased its tangible equity by $46.9 million, of which $32.7 million was attributable to retained earnings and approximately $13.6 million stemmed

---

5. In 1992, the minimum capital requirements stated that a "savings association's minimum risk-based capital requirement shall be an amount equal to 6% of its risk-weighted assets as measured pursuant to § 576.6 of this part plus 2% of its risk-weighted assets as measured pursu-ant to that section," a leverage-ratio requirement of a core-capital "amount not less than 3% of its adjusted total assets," and a tangible-capital requirement of "tangible capital ... in an amount not less than 1.5% of its adjusted total assets." 12 C.F.R. §§ 567.2(a), 567.8, 567.9 (1992).

from the conversion of Series B subordinate debentures into common stock. Def.'s App. at A–2010 (Form 10–K (1992)). Thus, during this three-year period, American Federal increased its regulatory tangible-capital position from a deficiency of $12.8 million to a positive $34.0 million. *Id.* Nevertheless, the bank explicitly stated that due to the expected future increases in the then-minimum capital requirements, it could provide "no assurance" that it would satisfy the projected higher requirements in the future. Def.'s App. at A–1965 (Form 10–Q (Sept. 30, 1992)).

On March 18, 1993, holders of the Series A subordinated debentures converted their securities into 2,173,912 shares of common stock without the payment of added consideration[6] and purchased an additional 2,195,650 shares of common stock for $12.625 million through the execution of their related mandatory purchase contracts. Pl.'s App. tab 46 (1993 Annual Report), at 40. Concurrently, holders of the Series I preferred stock that had been issued in April 1990 exchanged all of their shares for 2,340,768 shares of common stock without any payment of additional consideration. *Id.* In addition, the bank sold 2,083,955 shares, and the former Series A and Series I holders sold 4,126,045 shares, of common stock in a public offering, for a total of 6,210,000 shares at $8.75 a share. *Id.* American Federal realized net proceeds of $16.6 million from the sale, of which $2.1 million was allocated to the newly-issued common stock and the remaining proceeds were recorded as paid-in capital. *Id.* Thus, in March 1993, a total of approximately $29.4 million in additional capital was raised by American Federal through the issuance and sale of common stock, the exchange of subordinated debentures and preferred stock for common stock, and the execution of mandatory purchase contracts. *Id.* at 17.

At the end of March 1993, the bank was released from all provisions of its capital plan. Pl.'s App. tab 80 (Letter from Ryan to Abercrombie (Mar. 31, 1993)).

By April 1993, American Federal was classified as "well capitalized" and exceeded all of its capital requirements. Pl.'s App. tab 46 (1993 Annual Report), at 17–18.[7] In particular, on December 31, 1993, American Federal reported $89.612 million in risk-based capital, accounting for 14.17% of total assets, which was 6.17% above the minimum capital requirement and 4.17% above the requirement for a well-capitalized institution. *Id.* The bank also adopted, retroactive to January 1, 1993, the preferred accounting guidelines for goodwill as described in the Financial Accounting Standards Board's Statement of Financial Accounting Standards No. 72 ("SFAS 72"). *Id.* at 18.[8] The adoption of SFAS 72

---

6. American Federal's 1993 Annual Report, Pl.'s App. tab 46, at 40, and 1994 Annual Report, Pl.'s App. tab 51, at 36, indicated that holders of the Series A subordinated debentures received 2,173,192 shares, not 2,173,912 shares, as a result of their conversion. This recitation was apparently incorrect; it appears that the digits in the hundreds and tens place were mistakenly inverted in both documents. *See* Plaintiff's Response to Defendant's Proposed Findings of Uncontroverted Fact ("Pl.'s Resp. to Def.'s Facts"), at 46 (stating that the plaintiff did "not dispute th[e] proposed finding" that 2,173,912 shares of common stock were received from the conversion of Series A debt); Def.'s App. at A–2091 (Form 10–K (1993)) (noting that Series A subordinated debentures were converted into 2,173,-912 shares of common stock); *see also* Pl.'s App. tab 77 (Offering Circular (Jan. 19, 1989)), at 72 (stating that said debentures could be converted into an aggregate of 2,173,913 shares of common stock).

7. Under FIRREA and its implementing regulations, a financial institution could be classified in one of five categories. The category with the most demanding minimum capital requirements was the "well capitalized" category. A bank was "[w]ell capitalized" if the bank: "(i) [h]a[d] a total risk-based capital ratio of 10.0 percent or greater; and (ii)[h]a[d] a Tier 1 risk-based capital ratio of 6.0 percent or greater; and (iii)[h]a[d] a leverage ratio of 5.0 percent or greater." 12 C.F.R. § 565.4(b)(1) (1993).

8. Prior to SFAS 72 "thrifts were allowed to accrete the discount resulting from the mark-to-market over the average life of the loans and at the same time amortize the goodwill over a longer period. A thrift would thereby show a 'gain' in the earlier years following a supervisory merger." *Long Island Sav. Bank, FSB v. United States,* 60 Fed.Cl. 80, 84 n. 6 (2004) ("*Long Island II*") (citing *Winstar,* 518 U.S. at 852–55, 116 S.Ct. 2432; *see American Fed. Bank, FSB v. United States,* 58 Fed.Cl. 429, 431 n. 3 (2003). SFAS 72 "eliminated any doubt that the differential amortization periods on which acquiring thrifts relied to produce paper profits in supervisory mergers were inconsistent with [generally accepted accounting principles]." *Winstar,* 518 U.S. at 855, 116 S.Ct. 2432.

caused the bank to write off the remaining $36.2 million of unamortized goodwill as of January 1, 1993, and to announce that it no longer anticipated incurring any additional goodwill expenses relating back to the mergers from 1982. *Id.*[9]

American Federal declared its first quarterly dividend payable on August 16, 1993 at $0.05 per share. Def.'s App. at A–2061 (Press Release (July 15, 1993)). During 1994, quarterly dividends were increased to $0.06 per share with an annual dividend rate that year of $0.22 per share. *See* Pl.'s App. tab 51 (1994 Annual Report), at 1. Quarterly dividends rates increased in 1995 to $0.07 per share, and again in 1996 to $0.10 per share. Appendix to Defendant's ... Opposition to Plaintiff's Cross–Motion for Partial Summary Judgment on Damages at SA0081 (Press Release (July 20, 1995)); Def.'s App. at A–2113 (Minutes of Board of Directors Meeting (Mar. 21, 1996)); Plaintiff's Motion for Leave ... to Respond to the Court's Inquiry Regarding Dividend Payments ("Pl.'s Resp. on Dividends") Ex. B (1996 Annual Report). Finally, in 1997, American Federal established a dividend policy of quarterly payments of $0.12 per share. Pl.'s Resp. on Dividends Ex. D (Letter from Jean Rankin, Applications Manager, OTS, to Deborah A. Brady, Corporate Secretary, American Federal (Jan. 8, 1997)). The bank altered the dates of payments that year, issuing three separate dividend payments of $0.12 per share payable on February 10, May 12, and July 1, 1997, to adjust its dividend schedule in anticipation of the closing of the bank's merger to CCB Financial Corporation and ensure that American Federal's shareholders would receive four dividend payments that year. *Id.* Ex. C (Minutes of Board of Directors Meeting (May 15, 1997)). Cumulatively, from 1993 through March 1997, American Federal paid a total of $11.873 million in dividends to shareholders of its common stock. Pl.'s Resp. to Def.'s Facts at 55–56; Pl.'s App. tab 56 (Dr. Kormendi's First Supplemental Expert Report), Ex. D.[10]

In early 1996, the bank instituted a stock repurchase program whereby American Federal would buy up to 5% of the outstanding common shares over the succeeding 12 months. Def.'s App. at A–2112 to A–2113 (Minutes of Board of Directors Meeting (Mar. 21, 1996)), at A–2122 (Press Release (Mar. 21, 1996)). At the time, the bank had approximately 10.9 million shares outstanding, and thus the repurchase program involved up to approximately 550,000 shares. *Id.* On April 24, 1996, American Federal repurchased 7,000 shares of common stock. Def.'s App. at A–2128 (Minutes of Board of Directors Meeting (Apr. 24, 1996)). In addition, by July 9, 1996, 600,000 outstanding warrants, constituting all of the warrants associated with the 1989 sale of Series B subordinated debentures, were exercised or redeemed at an average net price of $10.45 per warrant. *See* Def.'s App. at A–2134 (Press Release (July 18, 1996)), A–2129 (Minutes of the Board of Directors Meeting (July 18, 1996)). One holder sought to exercise 60,000 of those warrants, and the remaining 540,000 were redeemed by American Federal. Def.'s App. at A–2128 (Minutes of the Board of Directors Meeting (Apr. 24, 1996)),

9. The bank also reduced goodwill by $3.7 million in 1993 for tax credits attributable to the mergers. Pl.'s App. tab 46 (1993 Annual Report), at 27.

10. American Federal asserts that only $8,805,464.50 in dividends were paid between March 1993 and June 1997 on what it denominates as "replacement shares." Pl.'s Resp. on Dividends at 9–10. Plaintiff's "replacement shares" include three categories of common stock: (1) 2,083,955 shares issued in 1993; (2) 2,340,768 shares issued to replace the Series I preferred shares; and (3) 2,195,650 shares issued from the exercise of the mandatory purchase contracts. *Id.* at 10 n. 4. Notably, the 2,173,912 shares issued in the conversion of Series A subordinated debentures are not included, *see id.,* and those shares accounted for approximately $2,369 million in paid dividends over the nearly four-year period. *Compare* Def.'s App. at A–2888 (Dr. Anjan V. Thakor's Expert Report (Mar. 22, 2005)), *with* Pl.'s App. tab 56 (Dr. Roger C. Kormendi's First Supplemental Expert Report (Jan. 19, 2005)), at 11 n. 3 (stating that these shares were not included in calculations because Series A debentures were not converted "directly into equity securities"). Based upon the reported March 1993 conversion of the Series A subordinated debentures into 2,173,912 shares of common stock, *see supra,* at 6 & n. 6, Dr. Kormendi's comment seems to be erroneous.

A–2129 (Minutes of the Board of Directors Meeting (July 18, 1996)).[11]

American Federal also attempted to expand its operations geographically in the mid–1990s. In April 1994, it proposed a merger with United Financial Corporation of South Carolina, but withdrew the proposal following opposition by United Financial shareholders. Def.'s App. at A–2100 (1994 Annual Report). The following year, the bank acquired six branches in the Midlands region of the state, holding deposits of approximately $113.5 million. Def.'s App. at A–2106 (Form 10–Q (June 30, 1995)).

In November 1996, American Federal received an unsolicited inquiry from CCB Financial Corporation ("CCB") of Durham, North Carolina about American Federal's interest in pursuing merger discussions. Def.'s App. at A–2172 (CCB Prospectus (June 19, 1997)). Subsequent to approval from American Federal's Board of Directors, formal merger negotiations began between executives of both banks in early 1997. *Id.* On February 17, 1997, the banks entered into an agreement whereby American Federal would be acquired by CCB. *Id.* at A–2173. Under the agreement, American Federal would merge with a newly created, wholly-owned subsidiary of CCB, with American Federal as the surviving corporate entity. Def.'s App. at A–2162 (Form 8–K (Feb. 17, 1997)). Ultimately, the merger was completed on August 1, 1997, for an indicated value of approximately $410.3 million. Def.'s App. at A–2174 (Press Release (Aug. 1, 1997)). The terms of the merger provided that "each share of $1.00 par value common stock of American Federal . . . shall be converted into and exchanged for the right to receive 0.445 of a share . . . of the $5.00 par value common stock of CCB." Def.'s App. at A–2162 (Form 8–K (Feb. 17, 1997)). On February 18, 1997, the day following the announcement of the merger agreement, American Federal's stock price closed at $27.50 per share, an increase of $6.00 from the previous day. Pl.'s Resp. to Def.'s Facts at 61.

Early in 2000, American Federal merged with a subsidiary of CCB, Central Carolina Bank and Trust Company, and American Federal ceased to exist as a separate corporate entity. Pl.'s Resp. to Def.'s Facts at 62. In July 2000, CCB Financial merged into National Bank of Commerce. *Id.* In October 2004, National Commerce Financial Corporation, National Bank of Commerce's parent company, merged with SunTrust Banks, Inc. *Id.* SunTrust Banks, Inc. is the parent company of the SunTrust group, which includes SunTrust Bank Holding Company and SunTrust Bank. *Id.* Thus, SunTrust Bank is the ultimate successor to American Federal pursuant to the merger between SunTrust Banks, Inc. and National Commerce Financial Corporation. *Id.* at 62–63.

## ANALYSIS

### A.   Standard for Decision

Summary judgment is appropriate if there is "no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Rules of the United States Court of Federal Claims ("RCFC") 56(c); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If a rational finder could reach only one reasonable conclusion, then a genuine issue of material fact does not exist. *See, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In considering whether a genuine issue of material fact exists, the court must draw all inferences in the light most favorable to the non-moving party. *Id.*

When a court considers cross-motions for summary judgment, it should evaluate each motion on its own merits and resolve any reasonable inferences against the party whose motion is being considered. *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1390–91 (Fed.Cir.1987). If genuine disputes exist regarding material facts, both motions must be denied. *Id.*

---

11. With the approval of OTS, the holder who advised American Federal of its intent to exercise its warrants was paid a net price of $10.125 per share to retire the warrants. Def.'s App. at A–2128 (Minutes of the Board of Directors Meeting (April 24, 1996)).

### B. Expectancy Damages

Compensation through money damages is the principal means of redressing a breach of contract. 24 Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts* (*"Williston"*) § 64:1, at 5 (4th ed.2002). "The principle of contract damages is that the non-breaching party is entitled to the benefits it reasonably would have received had the contract been performed, that is, profits that would have been earned but for the breach." *LaSalle Talman Bank, F.S.B. v. United States,* 317 F.3d 1363, 1371 (Fed.Cir.2003) (citing *United States v. Behan,* 110 U.S. 338, 345, 4 S.Ct. 81, 28 L.Ed. 168 (1884)); *see also Restatement (Second) of Contracts* § 344(a) & cmt. a (1981) (noting that when courts find a breach of contract, and subsequently provide a remedy, they generally "protect[ ] the expectation that the injured party had when [it] made the contract."). Such "expectancy damages" are normally equated with lost profits, although other measures for such damages may be applied. *Glendale Fed. Bank, FSB v. United States,* 239 F.3d 1374, 1380 (Fed.Cir.2001) (citing *Restatement (Second) of Contracts* § 347); *see also Williston* § 64:2, at 30 (stating that ordinarily expectancy damages include lost profits and other consequential losses caused by the breach).

On its facts, this case is similar to other *Winstar* cases in which, after the government's breach of contract, the bank mitigated its losses and survived. *See, e.g., LaSalle Talman,* 317 F.3d 1363; *Home Sav. of Am. v. United States,* 399 F.3d 1341 (Fed.Cir. 2005); *Long Island Sav. Bank, FSB v. United States,* 67 Fed.Cl. 616 (2005) (*"Long Island IV"*). Through its pleadings, expert reports, and arguments, American Federal advances two theories of recovery for the government's breach of the Substituted Goodwill Contract. First, American Federal seeks the cost of replacing the unamortized portion of its goodwill, *i.e.,* the "cost of replacement capital," plus its incidental losses in providing this mitigation. *See* Plaintiff's Response to Defendant's Motion for Summary Judgment Upon Damages and Cross-Motion for Partial Summary Judgment on Damages ("Pl.'s Cross-Mot.") at 18–20. Second, the bank also seeks lost profits. Pl.'s

Cross-Mot. at 28. Respecting the Subordinated Debt Contract, American Federal seeks recovery of its costs incurred in mitigating the government's breach of that contract when the bank converted subordinated debentures into common stock. Pl.'s Cross-Mot. at 15–17. The government counters that the bank's claims for cost of replacement capital are based upon an improper methodology and hypothetical scenarios, and that an award of lost profits is inappropriate because American Federal raised sufficient capital to mitigate fully any breach that occurred. Defendant's Motion for Summary Judgment on Damages ("Def.'s Mot.") at 27, 42–43.

The court denies both motions for summary judgment as to American Federal's claims based upon a cost-of-replacement-capital theory and upon incidental losses suffered in taking the mitigating steps. Disputed issues of fact as to those claims must be resolved through trial.

However, the court concurrently concludes that the government is entitled to partial summary judgment as to American Federal's claim for lost profits.

#### 1. Cost of replacement capital.

██ To determine its costs of replacing the regulatory capital lost because of FIRREA, American Federal relies on a mitigation model put forward by Dr. Roger C. Kormendi. That model seeks to measure the net costs of raising capital by issuing and selling several million shares of common stock, exchanging all of its subordinated debt, and issuing stock upon the exercise of mandatory stock purchase contracts. Pl.'s Cross-Mot. at 16, 18–19; Pl's.App. tab 56 (Dr. Kormendi's First Supplemental Expert Report), ¶¶ 42, 73, 83. The government asserts that Dr. Kormendi's mitigation model is an improper vehicle for measuring such damages largely because it incorporates a hypothetical event: a common stock issuance and exchange occurring on February 18, 1997. Def. Mot. at 28–29; Hr'g Tr. 7:5–7, 30:1–13 (July 25, 2005); *see* Pl.'s App. tab 56 (Dr. Kormendi's First Supplemental Expert Report), ¶¶ 42–44, 72–73. Both American Federal and the government have valid premises for some but not all of their arguments.

Dr. Kormendi began his analysis by looking to the efforts American Federal undertook in 1993 to raise capital through issuance of new stock. Pl.'s App. tab 56 (Dr. Kormendi's First Supplemental Expert Report), ¶ 69. He pointed to actual dividends that American Federal paid from 1993 to 1997 that it otherwise would not have had to issue on the shares from the public offering and mandatory purchase contracts. *Id.* ¶ 86. He adjusted this cost of capital by deducting the earnings American Federal generated by investing the capital raised in 1993 through the proceeds of the public offering and the exercise of the mandatory purchase contracts associated with the Series A subordinated debentures. *Id.* ¶¶ 84, 87–88.[12] However, Dr. Kormendi also incorporated into his analysis the actual value as of February 18, 1997, the date of the announcement of the merger with CCB, of the bank's common shares that were issued in 1993. *Id.* ¶¶ 73–74.[13] In total, Dr. Kormendi calculated the bank's cost of replacement capital arising from the breach of the Substituted Goodwill Contract at $33.513 million. *Id.* ¶ 88.

Dr. Kormendi separately calculated the cost of replacement capital attributable to the Subordinated Debt Contract. Dr. Kormendi computed the costs American Federal would have incurred in making periodic interest payments on, and ultimately redeeming, the original Series B subordinated debentures had they been left outstanding until February 18, 1997, as well as incremental earnings from the avoided interest costs. Pl.'s App. tab 56, ¶¶ 50–51. He derived the value, as of February 18, 1997, of American Federal's outstanding shares of common stock originating from the 1990 exchange of the Series B subordinated debentures and subsequently the 1993 exchange of the Series I preferred stock. *Id.* ¶ 37. He subtracted the costs from that value and concluded that American Federal was entitled to damages of $34.846 million calculated as a cost of replacement capital for the breach of the Subordinated Debt Contract. *Id.* ¶ 57.

It has become axiomatic that "the cost of replacement capital can serve as a valid theory for measuring expectancy damages in the *Winstar* context because it provides a measure of compensation based on the cost of substituting real capital for the intangible capital held by the plaintiff in the form of supervisory goodwill." *LaSalle Talman,* 317 F.3d at 1374 (internal quotations marks omitted). The government resists acceptance and application of this cost-of-replacement approach, and it concurrently contends that, even accepting that approach, Dr. Kormendi's model is flawed because it rests "upon a hypothetical issuance of common stock [and exchange] in February 1997." Def.'s Mot. at 28–29.

The government's first argument that the cost of replacement capital is limited to the transaction costs, *see* Def.'s Mot. at 34, is unavailing. "[I]t is well established that the payment of dividends *is a capital cost.*" *LaSalle Talman,* 317 F.3d at 1375 (emphasis added). Moreover, an "investor does not make a gift when the expected payment is dividends out of future earnings." *Id.* As in *Long Island II,* there can be no dispute that the efforts by American Federal to mitigate its damages through recapitalization "repre-

---

**12.** The exercise price of the mandatory purchase contracts was fixed. Dr. Kormendi thus deemed the cash capital raised in a breach or non-breach scenario to be identical, *see* Pl.'s App. tab 77 (Offering Circular (Jan. 19, 1989)), at 72, disregarding the time during which the mandatory purchase contracts could be exercised and the discretionary nature of that exercise. The terms of the Series A subordinated debentures provided that they would have a 15–year term and be noninterest bearing. *Id.* The holders could, at any time prior to redemption, convert the debentures into common stock. *Id.* Conversion triggered the obligation to purchase shares under the mandatory purchase contracts. *Id.* Consequently, no obligation arose to purchase shares under the mandatory purchase contracts, so long

as the conversion option for the Series A subordinated debentures was not exercised. As a result of Dr. Kormendi's dubious assumptions, he did not take into account the capital raised by way of these contracts, between the breach and but-for worlds, when calculating the cost of replacement capital in his analysis. *See* Pl.'s App. tab 56, at 27 n. 13.

**13.** Dr. Kormendi posits that, absent the breach, American Federal would not have replaced the goodwill it recorded as regulatory capital under the Substituted Goodwill Contract until 1997, when it would have raised capital through a stock offering and exchange. *Id.*

sent[ed] actual substitute performance." 60 Fed.Cl. at 96. In this case, Dr. Kormendi looked to proper starting points by which to determine American Federal's costs to replace its lost capital: the 1990 exchange of Series B subordinated debentures into Series I preferred stock and the subsequent 1993 exchange of Series I preferred stock into common stock, execution of mandatory purchase contracts, and concurrent public sale of over 2 million shares of additional common stock. Def.'s Mot. at 28 n. 25. These transactions, which collectively produced $29.4 million of additional tangible capital, Pl.'s App. tab 46 (1993 Annual Report), at 17, were intended to, and did, constitute American Federal's efforts to mitigate the losses caused by the government's breaches. Pl.'s App. tab 48 (Offering Circular (Mar. 12, 1993)), at 4, 6–7, 55–56 (advising that after the 1993 stock offering and exchange the bank expected to be released from its capital plan based on conversations with OTS). Only after these events was American Federal able fully to achieve capital compliance with OTS's requirements, plus a cushion, and be released from its capital plan on March 31, 1993. *See supra*, at 351–52.

There also is little doubt that the cost should be measured after American Federal exited the capital plan and achieved full mitigation. The capital plan filed by American Federal specifically contemplated the retention of earnings during the period the bank was under the plan. Pl.'s App. tab 12 (1990 Annual Report), at 21; *see* Def.'s App. at A–855 (Capital Plan). Here, the shareholders appeared to have had an expectation of receiving dividends, but not while the bank was subject to the plan. Hr'g Tr. 51:5–20 (July 25, 2005). Thus, no dividends were paid on the Series I preferred stock that was issued in 1990 in exchange for the Series B subordinated debentures, up to and until August 16, 1993, after American Federal converted the Series I preferred stock to common stock. Def.'s App. at A–2061 (Press Release (July 15, 1993)) (stating that a dividend would be issued at $0.05 per share). The cost of capital American Federal incurred "does not depend on whether payment is made as debt, or out of anticipated future earnings." *LaSalle Talman*, 317 F.3d at 1375. In short,

the cost of American Federal's replacement-capital mitigation should be measured by what it actually paid in dividends on the new and replacement capital. Moreover, American Federal's benefits from the newly paid-in capital must be taken into account as an offset to these costs. *See Home Savings*, 399 F.3d at 1354; *LaSalle Talman*, 317 F.3d at 1374–75; *Long Island IV*, 67 Fed.Cl. at 645.

The government's second argument has more merit. The government cites numerous prior decisions that "rejected the notion that a goodwill cost of replacement model ... can be based upon hypothetical transactions." Def.'s Mot. at 29. Instead, plaintiff's damages should be calculated according to the "actual means by which it filled its capital deficit." *Long Island II*, 60 Fed.Cl. at 95 (quoting *Commercial Fed. Bank v. United States*, 59 Fed.Cl. 338, 358 (2004), *aff'd*, 125 Fed.Appx. 1013 (Fed.Cir.2005)).

The flaw in Dr. Kormendi's model is as patent as the success of American Federal's mitigation. "[M]itigation is limited to actions reasonably directly related to the breach and its proximate consequences." *LaSalle Talman*, 317 F.3d at 1366. American Federal's mitigation was complete in March 1993. Although subsequent events such as dividend payments have a bearing on the cost of that mitigation, the proposed merger of American Federal and CCB four years later was extraneous to the breach and to the mitigation. *See* Pl.'s App. tab 46 (1993 Annual Report), at 17–18 (indicating that by 1993 American Federal fully satisfied all of its capital requirements); Def.'s App. at A–2105 (Form 10–Q (June 30, 1995)) (same). The merger with CCB is "commercial activity remote from the actions taken to achieve compliance with FIRREA" and thus "not properly viewed as action[ ] in mitigation of the FIRREA-induced breach." *LaSalle Talman*, 317 F.3d at 1374. Dr. Kormendi's use of a "[February 18,] 1997 hypothetical offering" as an "expositional device," *see* Def.'s App. at A–2642 (Deposition of Kormendi (Feb. 16, 2005)), A–2654, 2665 (Deposition of Kormendi (Feb. 17, 2005)), such that the bank's stock price on that date might be applied to calculate the cost of replacement capital neglects to take into account the remoteness of the

CCB merger from American Federal's mitigation efforts and the effect the merger had on American Federal's stock price at the time.[14] Therefore, the 1997 stock price cannot be used in measuring the actual cost of replacement capital.

The resulting issues can only be resolved through trial; the cross-motions for summary judgment regarding expectancy damages measured by the cost of replacement capital must be denied.

### 2. Lost profits.

■ Lost profits are recoverable as damages "where the damage proximately resulted from the breach, was foreseeable, and can be proven with reasonable certainty." *Long Island II*, 60 Fed.Cl. at 91 (citing *California Fed. Bank, FSB v. United States*, 245 F.3d 1342, 1349 (Fed.Cir.2001)). American Federal argues that it is entitled to approximately $31.146 million in lost profits arising from the breach of the Substituted Goodwill Contract because the bank did not fully replace the remaining unamortized goodwill that the government had promised could be recorded as regulatory capital. Pl.'s Cross–Mot. at 28.[15]

■ Nonetheless, American Federal is precluded from pursuing a damages claim for lost profits.

First, American Federal's lost-profits claim is not premised on any particular assets that had to be sold to achieve capital compliance but rather upon a lost opportunity to grow using the relatively small amount of goodwill ($4.16 million) that was not replaced with tangible capital. In this respect,

American Federal's expert, Dr. Kormendi, neither identified the types or the categories of investment opportunities American Federal would have pursued, nor did he frame his non-breach world in recognition of the bank's competition. *See* Pl.'s App. tab 56 (Dr. Kormendi's First Supplemental Expert Report), ¶¶ 89–116. As Dr. Kormendi concluded, he did not "try to identify specific [profitable] opportunities of one kind [or] another" with which the bank was presented after the 1993 stock offering and exchange, including any that it had to forgo. Def.'s App. at A–2656 (Deposition of Dr. Kormendi (Feb. 17, 2005)). Rather, he alleged only that American Federal would have leveraged its lost regulatory capital to "support additional earnings assets" that would have generated profits. Pl.'s App. tab 56 (Dr. Kormendi's First Supplemental Expert Report), ¶ 91. Lost profits have been awarded in *Winstar* cases where evidence showed that specific profitable assets had to be sold, *see Globe Sav. Bank, F.S.B. v. United States*, 65 Fed.Cl. 330, 350–361 (2005); *LaSalle Talman Bank, F.S.B. v. United States*, 64 Fed.Cl. 90, 100–106 (2005), *on remand from* 317 F.3d 1363 (Fed.Cir. 2003); *Commercial Fed. Bank*, 59 Fed.Cl. at 344–355, *aff'd*, 125 Fed.Appx. 1013 (Fed.Cir. 2005), but not where the reasonable-certainty requirement for expectancy damages was not satisfied. *See Glendale Fed. Bank, FSB v. United States*, 378 F.3d 1308, 1313 (Fed.Cir. 2004). In this instance, American Federal has put forward a model for calculating lost-profits damages that is so far removed from actual events and the requisite specificity

---

**14.** Wholly apart from this issue of proximate effects, American Federal errs when it claims that its stock price on February 18, 1997 was "independent" of the CCB merger. *See* Pl.'s Cross–Mot. at 16. As the government points out, American Federal's stock price rose $6.00 from the previous day after the merger announcement. *See* Def.'s Resp. to Pl.'s Facts at 61.

**15.** American Federal concedes that because it actually "replace[d] all of the promised regulatory capital" relating to the Series B subordinated debentures, Pl.'s Cross–Mot. at 28, it did not lose any profits from the breach of the Subordinated Debt Contract. *See id;* Hr'g Tr. 68:10–16 (July 25, 2005).

American Federal claims that as of March 31, 1993, it had $41.508 million in unamortized

goodwill that it could have treated as regulatory capital under the Substituted Goodwill Contract, but due to the government's breach only $7.554 million of Qualifying Supervisory Goodwill was treated as such. Pl.'s Cross–Mot. at 28–29; Pl.'s App. tab 56 (Dr. Kormendi's First Supplemental Expert Report), Ex. E at 2. Consequently, at that time, $33.954 of goodwill was eliminated by the government's breach. Pl.'s Cross–Mot. at 29. American Federal raised $29.797 million in capital through the 1993 stock offering and exchange. *Id.* American Federal's lost profits claim rests on the resulting $4.16 million of goodwill that was not replaced with newly raised tangible capital. Pl.'s Cross–Mot. at 29; *see also* Pl.'s App. tab 56 (Dr. Kormendi's First Supplemental Expert Report), ¶ 93, Ex. E at 1.

that the government is entitled to summary judgment on this claim.

Second, as an alternative ground for this ruling, an award of lost profits to American Federal would create a windfall for the bank because the bank fully mitigated the damage caused by the government's breach of contract. Following American Federal's 1993 stock offering and exchange, it recorded $89.612 million in risk-based capital, amounting to 14.17% of total assets, wrote off all remaining supervisory goodwill, and was released from its capital plan, all without also having to shrink its asset base. Pl.'s App. tab 46 (1993 Annual Report), at 17–18. In these circumstances, American Federal may not seek additional damages in the form of lost profits in addition to the damages attributable to the mitigation through acquiring replacement capital. *See Long Island IV*, 67 Fed.Cl. at 648–50.

Therefore, on either or both of these grounds, the government is entitled to summary judgment on the plaintiff's claim of lost profits.

### C. Reliance Damages

Reliance damages are available to a party who "relies on another party's promise made binding through contract … for any losses actually sustained as a result of the breach of that promise." *Glendale Federal*, 239 F.3d at 1382 (citing *Restatement (Second) of Contracts* § 344(b) (stating that the promisee's interest being protected is "his interest in being reimbursed for loss caused by reliance on the contract by being put in as good a position as he would have been in had the contract not been made")). American Federal claims that it sustained losses when it "overpaid" for the four thrifts it acquired in 1982, due to the government's promise in

the 1982 merger contracts that the bank could record the resulting goodwill as regulatory capital amortized over a forty-year period. Pl.'s Cross–Mot. at 49.[16]

American Federal's claim for reliance damages is flawed as a matter of law. First, the 1982 merger contracts were displaced and superseded in 1988 when the parties entered into the Substituted Goodwill Contract. *See American Federal*, 62 Fed.Cl. at 205. Second, American Federal errs when it claims that it may be awarded reliance damages as a means to "recover the value of the [promises contained in the 1982 merger contracts] as a proxy for the price [the bank] paid to enter [into] the [Substituted Goodwill Contract]." Pl.'s Cross–Mot. at 61. As this court previously found, the consideration that was exchanged under the Substituted Goodwill Contract consisted of the bank's agreement to a "longer amortization period than that sought by the government" and the government's "adopt[ion of] an 'aggressive' approach to American Federal's [modified stock conversion] application." *American Federal*, 62 Fed.Cl. at 202. Third, manifestly, American Federal did not pay any cash for the 1982 acquisitions; rather, it assumed the net liabilities of the thrifts. Def.'s App. at A–2614 (Deposition of S. Lynn Stokes (Feb. 15, 2005)). Thus, American Federal's claim for reliance damages is improperly based on a "paper deficit." *Glendale Federal*, 378 F.3d at 1312. For each of these reasons, the court grants the government summary judgment on American Federal's claim for reliance damages.

### D. Incidental Losses

American Federal seeks damages in the form of incidental losses that it asserts it would not have incurred but for the breaches

16. American Federal's expert, Mr. S. Lynn Stokes, opined that in "typical depository institution asset and liability transactions in the market at the time" purchasers would pay a "premium" of 3–6% above the deposit liabilities they acquired. Pl.'s Cross–Mot. at 54. Using a midpoint of 4.5%, Mr. Stokes calculated what he determined would be the cost to American Federal had it engaged in a market transaction that did not include a promise that supervisory goodwill could be recorded as regulatory capital. *Id.* Subtracting that figure from the approximately $61.1 million in goodwill that American Federal recorded from the 1982 acquisitions, Mr. Stokes concluded that the bank had paid an "excess premium" of approximately $50.6 million. *Id.* at 54–55. After making further adjustments for the government's partial performance of allowing the bank to record supervisory goodwill as regulatory capital and the bank's opportunity costs, Mr. Stokes indicated that American Federal should be entitled to $46.047 million in reliance damages. Pl.'s App. tab 57 (S. Lynn Stokes' (corrected) Expert Report (July 12, 2001)), ¶¶ 62, 69.

by the government. Pl.'s Cross–Mot. at 38–47. Plaintiffs are generally entitled to recover incidental losses insofar as "they protect the injured party's expectation interest but are separate and distinct from" the cost of replacement capital. *Globe Savings,* 65 Fed. Cl. at 361 (citing *Restatement (Second) of Contracts* § 347 cmt. c).

### 1. Cost of deposit insurance.

■ American Federal seeks to recover $211,000 in an increased deposit insurance premium that it paid in 1993. Pl.'s Cross–Mot. at 42. The government's expert, Dr. Christopher B. Barry, concedes this claim for incidental loss is "potentially valid" and that the bank's premium "did increase by $211,000 in 1993." Def.'s App. at A–3089 (Dr. Barry's Expert Report (Jan. 10, 2002)). The sole issue in dispute is whether the government's breach caused the increased deposit insurance premium. Def.'s Mot. at 26–27. American Federal has put forward evidence that the increased premium was the result of the government's breach of contract. *See, e.g.,* Pl.'s App. tab 69 (Deposition of Bradley J. Waring, Field Manager, OTS (June 3, 2005)), at 15 (indicating that the lower the MACRO rating, the higher the deposit premium that was to be paid). Furthermore, "because causation is a question of fact that ordinarily should be determined at trial," the government's motion for partial summary judgment on this claim is denied. *Long Island II,* 60 Fed.Cl. at 91.

### 2. Increased OTS assessments.

■ American Federal seeks to recover $312,000 for the costs of increased OTS assessments paid between 1990 and 1993. Pl.'s Cross–Mot. at 46. The government acknowledges that the bank's assessment costs were higher starting in 1990, but attributes such increases to a change in the manner by which OTS levied assessments after the implementation of FIRREA. Def.'s Mot. at 24. American Federal points to statements from OTS that a low MACRO rating, which the bank received during this time period, Pl.'s App. tab 41 (OTS Report of Examination

(July 29, 1991)), at 3, resulted in a higher OTS assessment fee. *See* Pl.'s App. tab 69 (Deposition of Waring (June 3, 2005)), at 14–15; Pl.'s App. tab 43 (Letter from Abercrombie to Ryan (Mar. 25, 1992)). In these circumstances, the court denies the government's motion for partial summary judgment on this claim and remits it to trial.

### 3. Cost of securitizing residential loans.

■ American Federal claims incidental losses of $385,243 based on the cost of securitizing residential loans. Pl.'s Cross–Mot. at 41. Beginning in 1990, as part of its capital plan, the bank converted many of its residential mortgage loans into mortgage-backed securities. Pl.'s App. tab 48 (Offering Circular (Mar. 12, 1993)), at 34–35. The loans were securitized to reduce American Federal's risk profile during the capital plan period. *Id.* The government concedes that these loans were securitized, but asserts that Mr. Stokes' calculation of any costs "entirely ignor[es] the benefits" the bank would have received. Def.'s Mot. at 26. American Federal counters that it received "no material benefits from the securitization." Pl.'s Cross–Mot. at 42 (citing Pl.'s App. tab 60 (Deposition of James M. Austin, III, Controller, American Federal (July 31, 2000)), at 136–137 (noting that the only "minor benefit" would arise if a loan "went bad" which did not occur with any of these securitized loans)).[17] Summary judgment is not appropriate on this damages claim as material issues of fact remain in dispute.

### 4. Cost of funds.

■ American Federal contends that it is entitled to recoup incidental losses of approximately $3.314 million attributable to the fact that the bank "had to pay more [by raising interest rates] to attract funds [in 1990 and 1991] as a result of the adverse publicity arising from the difficult capital position that the government's breach had created." Pl.'s Cross–Mot. at 39 (internal citations omitted). In support of this claim, American Federal puts forward calculations performed by Mr.

---

17. American Federal subsequently realized $3.6 million in proceeds from the sales of some of these mortgage-backed securities in 1991 and 1992, *see* Pl.'s App. tab 46 (1993 Annual Report), at 29, but there is no showing that the securitization was the root cause of this gain.

Stokes. Pl.'s Cross–Mot. at 39. The government resists this claim pointing to statements from the bank and its officials from the requisite time period, that indicated that American Federal was *not* affected by negative publicity, that it actually showed some growth in deposits, and that it paid a competitive rate for its deposits. *See* Def.'s App. at A–3280 to A–3281 (Letter from Abercrombie and Michael A. Trimble, Executive Vice President and COO of American Federal, to Ryan (Jan. 8, 1990)) (arguing that "American Federal's image is so strong within its market that it ... show[ed] modest deposit growth in 1989 in a period in which the Bank was bombarded by negative press"), and at A–3278 (Audit Plan (Dec. 31, 1990)) (stating that the bank is "paying competitive rates on its deposits and has not been adversely affected by the negative publicity surrounding the thrift industry."). Mr. Stokes stated that he calculated American Federal's increased cost of funds by analyzing the bank's interest rates relative to the market, Def.'s App. at A–2317 (Deposition of Stokes (Oct. 30, 2001)), but all of the other evidence presented to the court indicates that American Federal's cost of funds *decreased* in 1991 and 1992 relative to the South Carolina market. Def.'s App. at A–3142 (Dr. Barry's Expert Report (Jan. 10, 2002)) (showing that based on the bank's thrift financial reports, American Federal paid an average yield that was 0.556 and 0.639 percent below the South Carolina medians in 1990 and 1991 respectively). Moreover, in this respect, Mr. Stokes stated that he did not review the rating surveys that American Federal conducted to determine what interest rates their competitors were using. Def.'s App. at A–2317 (Deposition of Stokes (Oct. 30, 2001)).

The opinion of, and calculations by, Mr. Stokes are not enough by themselves to contravene the extensive documentary evidence that American Federal did not pay higher rates on its deposits due to adverse publicity. No genuine dispute of material fact on this issue appears on the record before the court. Consequently, the government is granted summary judgment on the plaintiff's claim for incidental losses due to increased cost of funds.

### 5. Capital plan costs.

■ American Federal seeks to recover incidental losses associated with preparation of its capital plan, principally measured by the time that its management spent on the plan. Pl.'s Cross–Mot. at 43. Again, calculations respecting this claim were made by Mr. Stokes. *Id.* The government argues that Mr. Stokes has not "connected his claim ... to the factual allegations in this case" and that there is no evidence that such costs would have been incurred with or without the breach. Def.'s Mot. at 23. American Federal counters with testimony of a number of its officials that described the time that was expended handling the bank's financial situation after the government's breach and during the capital plan period. Pl.'s Cross–Mot. at 43–45. American Federal may well be able to prove its out-of-pocket costs incurred in preparing the capital plan and its amendments, *see Globe Savings*, 65 Fed.Cl. at 363 (awarding damages for the preparation and presentation of a capital plan), but going further to establish causation for losses measured by management time expended seems problematic. Overall, given the paucity of the record on this issue, the government's motion for partial summary judgment respecting American Federal's alleged losses associated with preparation of its capital plan will be denied.

### 6. Transaction costs.

■ American Federal seeks approximately $1.61 million for its costs incurred in the public offering and the conversion of the Series I preferred stock to common stock in 1993. Pl.'s Cross–Mot. at 47–48. The government appears to contest causation by responding that "*assuming* [American Federal]'s actual capital-raising efforts in 1993 were undertaken due to the breach," the bank incurred $1.61 million in transaction costs "on a forward-looking basis" for the public offering and stock exchange. Def.'s Mot. at 27, 32. Consequently, the court denies American Federal's motion for partial summary judgment on this issue and remits the issue for trial.

### E. Declaratory Judgment

American Federal requests "a declaratory judgment that its claim for damages based on the costs associated with its efforts to raise capital to replace part of the capital lost through the government's breach [is] *not* limited to the transaction costs incurred in those efforts." Pl.'s Cross–Mot. at 49. However, a declaratory judgment on this issue is not appropriate because it would not "declare the rights and other legal relations of any interested party" within the meaning of the Declaratory Judgment Act, 28 U.S.C. § 2201. *See NUCOR Corp. v. Aceros Y Maquilas de Occidente S.A. de C.V.,* 28 F.3d 572, 578 (7th Cir.1994) (declaratory judgment may be entered if it clarifies and settles legal relationships); *Sarafin v. Sears, Roebuck & Co.,* 446 F.Supp. 611, 615 (D.Ill.1978) (issues addressed by declaratory judgment must be separable such that important and autonomous part of controversy can be resolved); *see also A.L. Mechling Barge Lines, Inc. v. United States,* 368 U.S. 324, 331, 82 S.Ct. 337, 7 L.Ed.2d 317 (1961) (declaratory relief is available at the discretion of the court). Wholly apart from the question whether, in this type of case, this court would have jurisdiction to enter such a declaratory judgment under the Tucker Act, 28 U.S.C. § 1491(a)(2), the request relates to one of several defenses being raised by the government to American Federal's claim for expectancy damages based on a cost-of-replacement-capital theory. *See supra,* at 356–57. The court will address that defense at the appropriate time in deciding American Federal's primary claim upon a record fully developed through trial.

### F. Tax Gross–Up

■ American Federal claims that any expectancy and reliance damages should be awarded on a pre-tax basis, *i.e.,* a "tax gross-up" should be applied to put the bank in the same position as if the breach had never occurred. Pl.'s Cross–Mot. at 65. The government counters that American Federal's claim for a tax gross-up is unsupported, speculative and would create an unfair windfall

for the bank. Def.'s Mot. at 47. Where supported by a factual record, the Federal Circuit has found that a "tax gross-up is appropriate when a taxable award compensates a plaintiff for lost monies that would not have been taxable." *Home Savings,* 399 F.3d at 1356 (citing *Oddi v. Ayco Corp.,* 947 F.2d 257, 267 (7th Cir.1991); and *First Nationwide Bank v. United States,* 56 Fed.Cl. 438, 449 (2003)); *see also Long Island IV,* 67 Fed.Cl. at 655–56; *LaSalle Talman,* 64 Fed. Cl. at 114–118. In this case, however, whether the potential damage awards would be taxable and what the marginal tax rate would be are issues that remain in dispute. Therefore, the court denies summary judgment on this issue and remits it for trial.

### CONCLUSION

For the reasons stated, the government's motion for summary judgment on damages is GRANTED insofar as it concerns plaintiff's claims based on lost profits, reliance damages, and incidental losses based on increased cost of funds. In other respects, the government's motion is DENIED. American Federal's cross-motion for summary judgment is DENIED.[18]

A trial on damages will be held in this case beginning on March 6, 2006 at the National Courts Building in Washington, D.C. In the interim, the parties shall abide by the scheduling order entered in this case on December 14, 2004, governing future filings and proceedings in this case.

IT IS SO ORDERED.

---

**18.** American Federal's motions for leave to notify the court of new authority, filed on August 4, 2005 and August 24, 2005, are GRANTED.